Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Oct 31 2012, 9:12 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**CYNTHIA PHILLIPS SMITH**
Law Office of Cynthia P. Smith
Lafayette, Indiana

ATTORNEYS FOR APPELLEE:

**ROBERT J. HENKE**
Indiana Department of Child Services
Indianapolis, Indiana

**CRAIG JONES**
Indiana Department of Child Services
Lafayette, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

IN THE MATTER OF THE TERMINATION OF )
THE PARENT-CHILD RELATIONSHIP OF J.D.: )
)
W.H., )
)
)
Appellant-Respondent, )
)
vs. )    No. 79A02-1203-JT-201
)
INDIANA DEPARTMENT OF CHILD SERVICES, )
)
Appellee-Petitioner. )

APPEAL FROM THE TIPPECANOE SUPERIOR COURT
The Honorable Loretta H. Rush, Judge
Cause No. 79D03-1110-JT-122

**October 31, 2012**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**NAJAM, Judge**

## STATEMENT OF THE CASE

W.H. ("Father") appeals the trial court's termination of his parental rights over J.D., his minor son. Father raises a single issue for our review, which we restate as the following two issues:

1. Whether the trial court's conclusion that continuation of the parent-child relationship posed a threat to J.D. is clearly erroneous; and

2. Whether the trial court's conclusion that termination of Father's parental rights over J.D. was in J.D.'s best interests is clearly erroneous.

We affirm.

## FACTS AND PROCEDURAL HISTORY

On October 18, 2011, the Indiana Department of Child Services ("DCS") filed a petition to terminate Father's parental rights over J.D. The trial court held an initial hearing on the DCS's petition that day and an evidentiary hearing on January 6, 2012. Following the evidentiary hearing, on February 13, 2012, the court entered its order and judgment terminating Father's parental rights.

In relevant part, the court found the following facts in its order:

1. [V.D.] (DOB 03/23/1978) is the Mother and [W.H.] (DOB 12/06/1966) is the Father of [J.D.] (DOB 09/03/2010).

2. Tippecanoe County Child Protective Services ("CPS") received a report on September 7, 2010[,] alleging that a child had been born to Mother whose parental rights were recently involuntarily terminated to an older half-sibling. Mother disclosed to hospital staff that she was currently on probation for related criminal charges. Investigation revealed the child was in the Neo-Natal Intensive Care Unit, required specialized feeding techniques, and would only be discharged when a feeding tube was no longer required. The parents had difficulty following the special feeding instructions, failed to attend all scheduled feedings, were easily frustrated, and seemed disinterested at times. Mother did not have all necessary

2

supplies for an infant. Father was unable to answer questions regarding basic infant care. Hospital staff noted that "father of baby and guests at bedside smelled strongly of alcohol[.]"

3. The child was placed in foster care pursuant to a CHINS Detention Hearing Order issued on or about September 10, 2010. A CASA was appointed to represent the best interests of the child. On October 6, 2010, the child was moved to a more experienced foster home better equipped to care for his special needs. The child was found to be a Child in Need of Services ("CHINS") and dispositional orders were issued on November 3, 2010[,] and November 17, 2010. The child has remained out of the parents' care continuously since that date.

4. The child was born with a cleft palate. Specialized bottles were required to assist with the child's difficulties in sucking and feeding. The child was at high risk for aspiration requiring thickening of liquids and upright positioning. The child is a silent aspirator requiring greater attention to special feeding techniques on a preventative basis. Muscle weaknesses complicated the issues related to the cleft palate. An initial diagnosis of failure to thrive also exacerbated the feeding issues related to the cleft palate. The child required weekly weight checks for several months. The child finally underwent surgery to repair the cleft palate at about ten (10) months of age and recovered well physically. The child is still at risk for aspiration and will require ongoing periodic specialist appointments to monitor progress.

5. In addition to the cleft palate and failure to thrive issues, the child has a congenital organic brain defect. The child has associated developmental delays requiring ongoing occupational therapy, physical therapy, and speech therapy. The brain abnormalities combined with the gross motor delays are expected to affect the child's eyesight. The likely duration of therapy will be through age four (4) at which time another surgery may be required to address speech delays.

6. Therapy exercises have been modified as the child's development progressed. It is recommended that therapies be incorporated into the child's normal routine on a daily basis. Failure to utilize therapy exercises will likely contribute to ongoing developmental delays and increased frequency of therapy exercises is preferred. Instruction has been provided to both Father and Stepmother to complete the therapy exercises with hands-on modeling and opportunity to implement the exercises during training sessions.

7.     Father struggled to learn proper holding and feeding techniques taking eight (8) months to complete appropriately.  Father struggled to recognize signs of aspiration in the child during feeding often attributing the signs to a cold instead.  Father continued to struggle with proper feeding techniques as the child developed.   Father struggled utilizing the recommended juice box demonstrating more comfort with a bottle.  Father also struggled following nutritional recommendations as the child developed.

8.     Father struggled to administer medications in proper dosages and at the correct times.  Each time medication was prescribed, there was at least one (1) time Father attempted to administer medication inappropriately.  On one occasion, Father attempted to determine the proper dose for Tylenol for thirty (30) to forty (40) minutes.  Assistance was provided and, even then, Stepmother incorrectly documented the dosage to later relay to the foster parent.

9.     Although Father appears to actively listen to instructions and asks questions, he consistently struggled to properly implement therapy exercises.   Father struggled to recognize the child's cues in order to implement the exercises during the child's normal routine.  During most visits, all recommended exercises were not completed.  Father was able to correctly complete only about twenty percent (20%) of therapy exercises.  The problem was exacerbated as each new exercise included steps from the old exercise as the child progressed.  Failure to properly and consistently implement therapy exercises is imperative for the child's development [sic].

10.     Father attended all medical appointments.  Father was not able to answer physician questions and occasionally provided incorrect information.  At medical appointments, foster mother has had to clarify inaccurate or unclear information provided by Father necessary for the physician to make appropriate recommendations.   The child is finally making progress developmentally and is now only approximately four (4) months delayed.   The child's progress became more noticeable when visitations were decreased.

11.     Father attended all visits as scheduled, provided all necessary supplies, and was always affectionate with the child.  Visitations were semi-supervised for a brief period but returned to fully supervised when it was discovered medication was again not being measured properly.  Father struggled with handling routine naps scheduled during longer visits and never demonstrated improvement in this area.   Father struggled with clothing and bathing at times.  Father continues to struggle implementing nutritional recommendations.  Hands-on parent training during supervised

visitations included much redirection to address safety concerns and to complete therapy exercises. Father is unable to recognize or comprehend safety issues without direct instruction. Father is currently unable to provide primary care for the child and has not demonstrated skills indicating this is likely to change in the future. Father is unable to be proactive in meeting the child's special needs and denies the need for supportive services.

12. Initially, Stepmother provided the majority of the care for the child until the Court ordered that Father provide primary care for the child during visitations. Stepmother's psychological evaluations in September 2010 revealed functional impairments in activities of daily living and interpersonal functioning. Stepmother was diagnosed with Mood Disorder NOS, Bulimia Nervosa, and Mild Mental Retardation. Although prior mental health records indicate excessive use of alcohol in the past as well as marijuana use, Stepmother has passed all random drug screens. Stepmother's current ability to parent could not be assessed due to a "failure to be forthcoming with information" or an inability to provide information due to her "low capabilities[.]" DCS Ex. 5.

* * *

14. Stepmother, [M.H.], was also offered the following services: psychological evaluation, individual therapy, couples counseling, family therapy, random drug screens, First Steps, Early Head Start, and supervised visitation. These services were exhaustive and were designed to address the parents' difficulties. Services were modified to accommodate the parents' cognitive delays.

15. Case conferences or family team meetings were held periodically. The [DCS] and CASA prepared separate written reports and recommendations prior to each hearing.

16. A permanency hearing commenced on July 5, 2011[,] and concluded on July 29, 2011[,] at which time the permanent plan remained reunification specifically with Father. A second permanency hearing was held on October 18, 2011[,] at which time the permanent plan was determined to be initiation of proceedings for termination of parental rights and adoption. DCS filed its petitions in the above-referenced Cause Nos. on October 18, 2011. The evidentiary hearing on the Verified Petitions to Terminate Parental Rights was held on January 6, 2012.

* * *

5

19.     Mother has a history of involvement in dangerous relationships. Mother and [J.D.'s half-sister A.D.'s] father regularly smoked marijuana together. Mother met [A.D.'s father] at a homeless shelter and their relationship was fraught with severe domestic violence. During the prior CHINS proceeding, Mother became intoxicated, had a sexual encounter with her friend's husband, Father, and became pregnant with [J.D.] Mother was aware that Father and his wife had been involved in violent incidents and reported being fearful that Father's wife would cause her bodily harm.

* * *

22.     As early as November 1, 2010, the Court authorized a trial home visit to begin with Father by agreement of the treatment team with intensive home-based services. Father's initial assessment for placement revealed concerns regarding the circumstances surrounding conception and potential domestic violence issues, a history of substance-abuse and criminal activity, and cognitive impairments.

23.     Father has a long-standing history of substance abuse and criminal behavior. Father was convicted of Reckless Driving (B Misdemeanor) on June 16, 1992, Theft (D Felony) on July 20, 1992, Theft (D Felony) on June 18, 1993, Battery (A Misdemeanor) on April 3, 1995, Operating a Vehicle While Intoxicated (A Misdemeanor) on October 20, 1997, Public Intoxication (B Misdemeanor) on October 19, 2001, Operating Motor Vehicle While Suspended (Class A Misdemeanor) on April 1, 2002, Operating a Motor Vehicle While Suspended on April 22, 2002, Operating a Vehicle While Intoxicated (A Misdemeanor) on June 1, 2004, and Public Intoxication (B Misdemeanor) on August 29, 2008. Sentencing orders noted a history of criminal activity, violation of probation, and chronic use of alcohol as aggravating factors. During the CHINS proceeding, Father passed all random drug screens. Father has not been involved in any criminal activity since 2008.

24.     Father was involved in community-based services prior to the CHINS proceeding. Father's biopsychosocial-psychiatric evaluations in August/September 2008 revealed diagnoses of Depressive Disorder NOS, Anxiety Disorder NOS, and Borderline Intellect. Assessments indicate an IQ of 67. Father had previously been diagnosed with Adjustment Disorder and placed on medications. Father stopped taking his medications and attending treatment when he lost Medicaid. Father has functional deficits in his ability to utilize community resources and maintain a safe living environment. Father's ability to balance tasks associated with successful parenting would be "extremely difficult[.]" Father has consistently

attended individual counseling since August 2008 and reports he intends to continue individual counseling. DCS Ex. 3.

25. Father is forty-five (45) years old. Father was last employed at Purdue University but quit in the summer to be available as a primary caregiver. Father receives disability benefits and is able to meet household expenses when combined with Stepmother's disability benefits. Father has been married to Stepmother for eleven (11) years. Father has a driver's license and a vehicle.

26. CASA, Trent Haverkamp, supports termination of parental rights in the best interests of the child. Father and Stepmother lack a true understanding of the child's developmental delays. Cognitive limitations prevent Father from grasping the steps necessary as the child develops to meet the child's needs. Constant support and supervision would be required and there are no service providers or other supports available on a twenty-four (24) hour basis. Mother has had no contact with the child over an extended period. The child is adoptable despite his special needs.

27. Neither Father nor Stepmother is likely to intentionally inflict harm on the child. Nevertheless, the child's special needs are not consistently met by either during supervised visitations. The parents failed to appropriately provide safe care for the child on at least twenty (20) occasions excluding failure to complete therapy exercises. Visitations remain fully supervised despite an agreement to transition to semi-supervised visitations after two (2) full weeks of visitations without safety concerns as this never occurred. The child's physical health would be endangered and the child's development would otherwise be impaired. Father is unable or unwilling to internalize and implement skills necessary to meet the child's special needs.

28. Although Father and Stepmother have participated in services, they have been unable to meet the child's progressive needs. Father's plan for Stepmother to be a primary caregiver posed a significant concern. Stepmother's level of cognitive functioning is even lower than Father's and she has been unable to demonstrate appropriate parenting. Although Father modified his employment to become the primary caregiver, he is still reluctant to accept that Stepmother is not a safe and appropriate caregiver for the child without supervision. It is not safe for the child to be in the care of Mother or Father at this time. All imaginable services have been offered and nothing is singularly different in today's circumstances since the time of removal. To continue the parent-child relationships would be detrimental to the child. The child needs permanency now.

Appellant's App. at 10-14.

In light of its findings, the trial court concluded as follows:

1.     There is a reasonable probability that the conditions that resulted in the removal of the child from the parents' care or the reasons for the continued placement outside the home will not be remedied. Father has yet to demonstrate the ability to meet the needs of the child. Mother has completely abandoned the child. There is no reasonable probability that either parent will be able provide adequate care for this child.

2.     Continuation of the parent-child relationships poses a threat to the well-being of the child. The child needs stability in life. The child needs parents with whom the child can form a permanent and lasting bond to provide for the child's emotional and psychological as well as physical well-being. The child's well-being would be threatened by keeping the child in parent-child relationships with either parent who is unable to meet the needs of this child.

3.     DCS has a satisfactory plan of adoption for the care and treatment of this child following termination of parental rights. The child can be adopted and there is reason to believe an appropriate permanent home has or can be found for this child.

4.     For the foregoing reasons, it is in the best interests of [J.D.] that the parental rights of [V.D.], Mother, and [W.H.], Father, be terminated.

Id. at 14. This appeal ensued.

**DISCUSSION AND DECISION**

**Overview**

We begin our review by acknowledging that "[t]he traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." Bailey v. Tippecanoe Div. of Family & Children (In re M.B.), 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), trans. denied. However, a trial court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding a termination. Schultz v. Porter Cnty Office of Family &

8

Children (In re K.S.), 750 N.E.2d 832, 837 (Ind. Ct. App. 2001). Termination of a parent-child relationship is proper where a child's emotional and physical development is threatened. Id. Although the right to raise one's own child should not be terminated solely because there is a better home available for the child, parental rights may be terminated when a parent is unable or unwilling to meet his or her parental responsibilities. Id. at 836.

Before an involuntary termination of parental rights can occur in Indiana, the DCS is required to allege and prove, among other things:

(B) that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

\* \* \*

(C) [and] that termination is in the best interests of the child . . . .

Ind. Code § 31-35-2-4(b)(2).[1] That statute provides that DCS need establish only one of the requirements of subsection (b)(2)(B) before the trial court may terminate parental rights. The DCS's "burden of proof in termination of parental rights cases is one of 'clear and convincing evidence.'" R.Y. v. Ind. Dep't of Child Servs. (In re G.Y.), 904 N.E.2d 1257, 1260-61 (Ind. 2009) (quoting I.C. § 31-37-14-2).

---

[1] Indiana Code Section 31-35-2-4(b)(2)(B) also allows the DCS to allege that "[t]he child has, on two (2) separate occasions, been adjudicated a child in need of services." But that additional, alternative provision is not relevant here.

9

When reviewing a termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. Peterson v. Marion Cnty Office of Family & Children (In re D.D.), 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), trans. denied. Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. Id. Moreover, in deference to the trial court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. Judy S. v. Noble Cnty Office of Family & Children (In re L.S.), 717 N.E.2d 204, 208 (Ind. Ct. App. 1999). trans. denied.

Here, in terminating Father's parental rights, the trial court entered specific factual findings and conclusions thereon. When a trial court's judgment contains specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. Bester v. Lake Cnty. Office of Family & Children, 839 N.E.2d 143, 147 (Ind. 2005). First, we determine whether the evidence supports the findings and, second, we determine whether the findings support the judgment. Id. "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." Quillen v. Quillen, 671 N.E.2d 98, 102 (Ind. 1996). If the evidence and inferences support the trial court's decision, we must affirm. In re L.S., 717 N.E.2d at 208.

Father does not challenge the trial court's findings of facts in its January 2012 order terminating his parental rights. Rather, Father challenges only the court's legal conclusions that, on these facts, termination of his parental rights is justified because a

continuation of the parent-child relationship posed a threat to J.D.'s well-being[2] and that the termination of his parental rights is in J.D.'s best interests. We address each argument in turn.

### Issue One: Whether Continuation of the Parent-Child Relationship Posed a Threat to J.D.

We first consider Father's assertion that continuation of the parent-child relationship did not pose a threat to J.D. A trial court need not wait until a child is irreversibly influenced by a deficient lifestyle such that his physical, mental, and social growth is permanently impaired before terminating the parent-child relationship. Shupperd v. Miami Cnty Div. of Family & Children (In re E.S.), 762 N.E.2d 1287, 1290 (Ind. Ct. App. 2002). When the evidence shows that the emotional and physical development of a child in need of services is threatened, termination of the parent-child relationship is appropriate. Id.

On this issue, Father asserts that, per the DCS's instructions, he has regularly attended therapy and made good progress; his apartment is clean; he has participated in case management services; he visited J.D.; he did not "abuse or neglect" J.D., Appellant's Br. at 15; and he "compl[ied] with the instructions . . . to provide his son with the appropriate physical therapy," id. at 16.

The trial court considered Father's efforts in its order. Indeed, the court expressly acknowledged that "Father has consistently attended individual counseling," Appellant's App. at 13; that Father "appears to actively listen to instructions and asks questions," id.

---

[2] Father also asserts that the DCS's evidence fails to show that Father will not remedy the conditions that resulted in J.D.'s removal, but we need not consider that argument given the disjunctive nature of Indiana Code Section 31-35-2-4(b)(2)(B) and our holding that the trial court's conclusion is justified under on subsection (b)(2)(B)(ii).

at 11; that he "attended all medical appointments" and "all visits," id.; and that Father is not "likely to intentionally inflict harm on the child," id. at 14.

Nonetheless, the court also found facts less favorable to Father. Namely, the court found: that "Father . . . lacks a true understanding of the child's developmental delays," id. at 13; that "[c]ognitive limitations prevent Father from grasping the steps necessary as the child develops to meet the child's needs," id.; that "Father struggled to learn proper holding and feeding techniques . . . [and] to recognize signs of aspiration in the child[,] . . . often attributing the signs to a cold instead," id. at 11; that "Father . . . struggled following nutritional recommendations as the child developed," id.; that "Father struggled to administer medications in proper dosages and at the correct times," id.; that he "consistently struggled to properly implement therapy exercises," which "was exacerbated as each new exercise included steps from the old exercise as the child progressed," id.; that Father "was not able to answer physician questions and occasionally provided incorrect information," id.; that he "struggled with handling routine naps . . . [and] with clothing and bathing at times," id.; that "Father is unable to recognize or comprehend safety issues without direct instruction . . . [and] is currently unable to provide primary care for the child," id.; that he "is unable to be proactive in meeting the child's special needs and denies the need for supportive services," id.; and that Father "failed to appropriately provide safe care for the child on at least twenty (20) occasions excluding failure to complete therapy exercises," id. at 14.

Again, Father does not challenge the veracity of the trial court's findings. Instead, his argument on appeal merely seeks to have this court assign greater weight to the facts

favorable to him over the facts favorable to the trial court's judgment. We cannot reweigh the evidence on appeal. The trial court's findings are supported by the evidence and its judgment is supported by its findings. Accordingly, we agree with the trial court that the termination of Father's parental rights over J.D. was appropriate under Indiana Code Section 35-35-2-4(b)(2)(B)(ii).

**Issue Two: Whether Termination was in**
**J.D.'s Best Interests**

Father also argues that the DCS failed to show that termination of the parent-child relationship was in J.D.'s best interests. In determining what is in the best interests of a child, the trial court is required to look beyond the factors identified by the DCS and to consider the totality of the evidence. Stewart v. Ind. Dep't of Child Servs. (In re J.S.), 906 N.E.2d 226, 236 (Ind. Ct. App. 2009). We have previously held that the recommendations of the case manager and CASA to terminate parental rights, in addition to evidence that the continuation of the parent-child relationship poses a threat to the child, is sufficient to show by clear and convincing evidence that termination is in the child's best interests. M.M. v. Elkhart Office of Family & Children (In re M.M.), 733 N.E.2d 6, 13 (Ind. Ct. App. 2000).

Here, in addition to the evidence described above in Issue One, CASA Haverkamp testified that termination of Father's parent-child relationship over J.D. was in J.D.'s best interests. The family case manager for the DCS, Keith Luebcke, also testified that termination of the parent-child relationship was in J.D.'s best interests. Accordingly, the trial court's conclusion that termination of Father's parental rights over J.D. was in J.D.'s best interests is not clearly erroneous. See id.

13

## Conclusion

In sum, the trial court's order terminating Father's parental rights over J.D. is not clearly erroneous. The trial court concluded that continuing the parent-child relationship would pose a threat to J.D. and was not in J.D.'s best interests. The court's conclusions are supported by its findings and its findings are supported by the evidence. Accordingly, we affirm the trial court's termination of Father's parental rights over J.D.

Affirmed.

KIRSCH, J., and MAY, J., concur.