**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**

ATTORNEY FOR APPELLANT:

**LILABERDIA BATTIES**
Batties & Associates
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**ROBERT J. HENKE**
Indiana Department of Child Services
Indianapolis, Indiana

**PATRICK M. RHODES**
Indiana Department of Child Services
Indianapolis, Indiana

**FILED**

Nov 09 2012, 9:21 am

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| IN THE MATTER OF THE TERMINATION OF THE PARENT-CHILD RELATIONSHIP OF I.C., J.C., and P.C., MINOR CHILDREN: | ) ) ) ) |
| E.C., | ) ) |
| Appellant-Respondent, | ) ) |
| vs. | ) ) No. 49A02-1204-JT-273 |
| INDIANA DEPARTMENT OF CHILD SERVICES, | ) ) ) |
| Appellee-Petitioner. | ) |

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Marilyn A. Moores, Judge
Cause Nos. 49D09-1105-JT-20951, 49D09-1105-JT-20952 and 49D09-1105-JT-20953

**November 9, 2012**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**NAJAM, Judge**

## STATEMENT OF THE CASE

E.C. ("Father") appeals the trial court's termination of his parental rights over his minor children I.C., J.C., and P.C. ("the children"). Father raises a single issue for our review, which we restate as the following two issues:

1. Whether the trial court's conclusion that continuation of the parent-child relationships poses a threat to the children is clearly erroneous; and

2. Whether the trial court's conclusion that termination of Father's parental rights over the children is in the children's best interests is clearly erroneous.

We affirm.

## FACTS AND PROCEDURAL HISTORY

On May 27, 2011, the Indiana Department of Child Services ("DCS") filed a petition to terminate Father's parental rights over the children. The trial court held an evidentiary hearing on February 15 and 29, 2012, with Father participating by telephone from prison in Pennsylvania. Following the evidentiary hearing, on March 6, the trial court entered its order and judgment terminating Father's parental rights.

In relevant part, the court found the following facts in its order:[1]

1. [L.C.] is the mother, and [E.C.] is the father, of [I.C.], [J.C.], and [P.C.], minor children born on October 13, 2002, July 31, 2004 and April 24, 2007, respectively.

2. Children in Need of Services Petitions "CHINS" were filed on the children in December of 2009, under Cause Numbers 49D090912JC056616-8. The children were ordered removed from the [parents] at an initial hearing on December 15, 2009.

---

[1] The trial court also terminated the parental rights of the children's mother, L.C. ("Mother"), but she does not participate in this appeal. Accordingly, we consider only the facts relevant to the termination of Father's parental rights.

2

3. On January 14, 2010, [Mother] admitted to allegations that the children were in need of services due to their parents having failed to provide a safe and appropriate living environment, the home was in poor condition, and [Father] was incarcerated.

4. The children were formally removed from their mother['s care] on January 14, 2010, pursuant to a dispositional order. They have been removed for at least six (6) months.

* * *

19. The children were found to be in need of services as to their father on February 11, 2010. Disposition was held on that date at which time the children were formally removed from [Father]. They have now been removed for at least six (6) months.

20. Although services were ordered at [Father's] disposition hearing in the CHINS matter, [Father] has remained incarcerated in Indiana and Pennsylvania, and therefore no services were referred. [Father] has maintained contact with the [DCS].

21. While incarcerated in the Westfield Correctional Facility in Indiana, [Father] completed an Inside Out Dad Program in 2010, and an Anger Management Skills Class and Re-Entry Program in September of 2011.

22. [Father] had previously received his G.E.D. while incarcerated in 2009, and during his incarceration in Westfield Correctional Facility in Indiana, he participated in a Therapeutic Community Substance Abuse program for approximately six months before being removed from the program due to a rules violation.

23. Since the birth of the three children, [Father] has been convicted of three felonies in Indiana alone. He has a criminal history in Pennsylvania and Ohio.

24. [Father]'s convictions include Domestic Battery, Battery, and Criminal Confinement.

25. At the time of his release from the Westfield Facility, [Father] had six old warrants out from Franklin County, Ohio.

26. Upon the payment of $100.00, and with the consent of a judge after an investigation, [Father] would be released from jail on March 19, 2012.

3

27.     [Father] could be released to Indiana to finish his probation through an Interstate Compact.  [Father] is also to be on probation from an Indiana sentence until March 24, 2013.

28.     [Father] has previously violated probation in Indiana and Pennsylvania by failing to report.

29.     [Father] last saw his children in August of 2009.  He sends cards and letters.

30.     Conflicting testimony was presented regarding the nature of [Father]'s role as a father prior to the CHINS proceeding.  However, Anita Moody first met [Mother] through the Gabriel Project when [Mother] was pregnant and fleeing an abusive situation with [Father].

31.     Ms. Moody maintained contact with the family and still maintains contact with the three children.

32.     Ms. Moody observed [Father] as being a good father "early on" to [I.C.] prior to his substance abuse.

33.     After arrests [Father] would tell Ms. Moody that he was going to "clean up and be the dad he's never been," but would turn to drugs and "take off" when problems arose.

34.     [Father] has spent a major part of the children's lives incarcerated.

35.     [Father] has two older children who are not parties to the CHINS matter and this termination matter.  They reside with paternal relatives.

36.     [Father] has not seen his twelve year old daughter since she was six months old.

37.     There is a reasonable probability that the conditions that resulted in the removal and continued placement of the children outside the home will not be remedied by their father.  At the time of trial in this matter, [Father] was not available or in a position to care for his children.  Given [Father]'s criminal history, including probation violations, it is not probable that he would remain available to parent in the future.  He has a history of saying he will do the right thing but fails to follow through.

38.     Continuation of the parent-child relationship between [Father] and his children would pose a threat to their well-being.  Upon his release from incarceration, [Father] would have to obtain appropriate housing and

4

adequate income, complete his probation, and be assessed for additional services. At the time of trial it was unknown when [Father]'s release would be, or if he could return to Indiana. The children have been moved in and out of foster care for two years, and are in need of a sense of permanency. They should not have to continue to spend an unknown amount of time in limbo, and to sever [Father]'s parental rights would enable the children to accomplish permanency through adoption.

39. The children are currently placed together in a therapeutic foster care home. This home is preadoptive. The children are doing well in their placement and their needs, including therapy, are being met.

40. The foster parents have been observed as being loving and supportive.

41. [I.C.] misses her parents but has feelings of abandonment and wishes to be adopted.

42. Termination of the parent-child relationship is in the best interests of the children. Termination, providing for a subsequent adoption, would provide them with permanency in a safe and stable environment where their needs will be met.

43. Given [Mother] having given up on services, [Father]'s incarcerations and not taking care of his older two children, the time the CHINS has been pending, and the children's need for a sense of permanency, the [DCS] family case manager, Lakisha Wren believes adoption would be in the children's best interests.

44. The permanency plan of adoption is a satisfactory one for the future care and treatment of the children.

45. The children's Guardian Ad Litem recommends adoption for the children, and does not believe that granting [Father and Mother] additional time would be in their best interests.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that the parent-child relationship between [I.C., J.C., P.C.] and their parents, [Mother] and [Father] is hereby terminated.

Appellant's App. at 35-39. This appeal ensued.

## DISCUSSION AND DECISION

### Overview

We begin our review by acknowledging that "[t]he traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." Bailey v. Tippecanoe Div. of Family & Children (In re M.B.), 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), trans. denied. However, a trial court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding a termination. Schultz v. Porter Cnty Office of Family & Children (In re K.S.), 750 N.E.2d 832, 837 (Ind. Ct. App. 2001). Termination of a parent-child relationship is proper where a child's emotional and physical development is threatened. Id. Although the right to raise one's own child should not be terminated solely because there is a better home available for the child, parental rights may be terminated when a parent is unable or unwilling to meet his or her parental responsibilities. Id. at 836.

Before an involuntary termination of parental rights can occur in Indiana, the DCS is required to allege and prove, among other things:

(B) that one (1) of the following is true:

> (i)  There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

> (ii)  There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

\* \* \*

6

(C) [and] that termination is in the best interests of the child . . . .

Ind. Code § 31-35-2-4(b)(2).[2]  That statute provides that DCS need establish only one of the requirements of subsection (b)(2)(B) before the trial court may terminate parental rights.  The DCS's "burden of proof in termination of parental rights cases is one of 'clear and convincing evidence.'"  R.Y. v. Ind. Dep't of Child Servs. (In re G.Y.), 904 N.E.2d 1257, 1260-61 (Ind. 2009) (quoting I.C. § 31-37-14-2).

When reviewing a termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. Peterson v. Marion Cnty Office of Family & Children (In re D.D.), 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), trans. denied.  Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment.  Id.  Moreover, in deference to the trial court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous.  Judy S. v. Noble Cnty Office of Family & Children (In re L.S.), 717 N.E.2d 204, 208 (Ind. Ct. App. 1999). trans. denied.

Here, in terminating Father's parental rights, the trial court entered specific findings of fact and conclusions thereon.  When a trial court's judgment contains special findings and conclusions, we apply a two-tiered standard of review.  Bester v. Lake Cnty. Office of Family & Children, 839 N.E.2d 143, 147 (Ind. 2005).  First, we determine whether the evidence supports the findings and, second, we determine whether the findings support the judgment.  Id.  "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference."  Quillen v. Quillen, 671

---

[2]  Indiana Code Section 31-35-2-4(b)(2)(B) also allows the DCS to allege that "[t]he child has, on two (2) separate occasions, been adjudicated a child in need of services."  But that additional, alternative provision is not relevant here.

7

N.E.2d 98, 102 (Ind. 1996). If the evidence and inferences support the trial court's decision, we must affirm. In re L.S., 717 N.E.2d at 208.

Father does not challenge the trial court's findings of fact in its March 6, 2012, order terminating his parental rights. Rather, Father challenges only the court's legal conclusions that, on these facts, termination of his parental rights is justified because a continuation of the parent-child relationships poses a threat to the children's well-being[3] and that the termination of his parental rights is in the children's best interests. We address each argument in turn.

### Issue One: Whether Continuation of the Parent-Child Relationship Poses a Threat to the Children

We first consider Father's assertion that continuation of the parent-child relationships does not pose a threat to the children. A trial court need not wait until a child is irreversibly influenced by a deficient lifestyle such that his physical, mental, and social growth is permanently impaired before terminating the parent-child relationship. Shupperd v. Miami Cnty Div. of Family & Children (In re E.S.), 762 N.E.2d 1287, 1290 (Ind. Ct. App. 2002). When the evidence shows that the emotional and physical development of a child in need of services is threatened, termination of the parent-child relationship is appropriate. Id.

First, we observe that, while Father states that continuation of the parent-child relationships does not pose a threat to the children, he does not make cogent argument in direct support of that contention. Instead, Father focuses most of his argument on the

---

[3] Father also asserts that the DCS's evidence fails to show that Father will not remedy the conditions that resulted in the children's removal, but we need not consider that argument given the disjunctive nature of Indiana Code Section 31-35-2-4(b)(2)(B) and our holding that the trial court's conclusion is justified under on subsection (b)(2)(B)(ii).

failure to remedy conditions element of the statute. Regardless, we will consider the issue in light of the general argument Father makes in his brief on appeal.

In essence, Father maintains that he has made "positive strides" toward being a good father in obtaining his GED, participating in the Inside Out Dad program in prison, as well as participating in anger management and substance abuse programs. Brief of Appellant at 11. Father asserts that because his release from incarceration in Pennsylvania was "imminent" at the time of the termination hearing, no harm would have come to the children had the trial court merely postponed the hearing for a short time for him to demonstrate that he could parent the children. Id. at 12. He maintains that he has a cousin who lives in Indianapolis who had indicated that he would help Father find a job and obtain housing upon his release. Finally, Father points out that he has maintained regular contact, via cards and letters, with his children during his incarceration.

But the State points out that whether Father would be released in March 2012 and would be able to return to Indiana from Pennsylvania was mere speculation. In particular, the State directs us to the following testimony by Father's probation officer:

Q:   At this time what is the maximum amount of time [Father] could be held in Pennsylvania?

A:   On this offense, August 19, 2013.

Q:   Is there a process by which [Father] could be transferred to Indiana?

A:   Yes, there is.

Q:   What would that process be?

A:   Well, he has to make application for parole, if he provides an out of state address he has to, we have to through the pre-parole process

9

send paperwork to the State of Indiana requesting that his parole supervision be transferred to that State.

Q: What would it take to begin that process?

A: Well, in [Father]'s case at the time of his sentencing the Judge ordered that he pay the one hundred dollar[s] required prior for the application to be processed.

Q: Has [Father] paid that fee?

A: Not as of yesterday.

Q: Even if [Father] does pay the fee and the investigation starts to transfer his probation is there any guarantee that Indiana will accept his probation?

A: No.

Transcript at 4-5.

Moreover, the State points out that Father can only speculate whether he could get a job or obtain housing upon his return to Indiana. Father's cousin, Mark Kiner, testified merely that "[p]rovided [Father] makes his way back to Indianapolis[, Kiner had] a few ties in the construction field to try to get him work lined up, you know some masonry work or landscaping work[.]" Id. at 117. Kiner, who manages a landscaping company, rejected the notion that Father could work for him upon his return. Kiner noted that Father had worked for him in the past, and Kiner suggested that such an arrangement at this time would not be "wise." Id. at 120. And Kiner testified that, while he could help Father look for housing, Father would not be welcome to live with Kiner and his family.

But Father's contention on this issue amounts to a request that we reweigh the evidence, which we will not do. Indeed, Father does not challenge any of the trial court's findings on appeal. The evidence shows that Father has a criminal history that includes

10

domestic violence against Mother and several arrests and convictions in several states. And in July 2008, Father had then-four-year-old J.C. in his car with him when police attempted to pull him over. Father led police on a car chase, and, after Father finally stopped, he exited his vehicle holding J.C. in his arms. Police used pepper spray and a taser gun against Father. Some of the pepper spray landed on J.C. during the encounter, which resulted in Father being sentenced to thirty-six months, with sixteen months executed. It is because of Father's incarceration in 2009, after convictions for receiving stolen property and battery, that Father has not seen the children since August 2009. Finally, Father has violated the terms of his probation on more than one occasion, and he was removed from a substance abuse treatment program while incarcerated for violating a rule prohibiting possession of certain contraband.

Again, the trial court need not wait until a child is irreversibly influenced by a deficient lifestyle such that his physical, mental, and social growth is permanently impaired before terminating the parent-child relationship. Shupperd, 762 N.E.2d at 1290. Given the lack of certainty as to when Father might be released from prison and might return to Indiana, as well as the lack of certainty that Father will be able to obtain housing and employment, Father cannot show that he will be able to provide adequate care or permanency for the children in the future. Father has not demonstrated that the trial court's conclusion that continuation of the parent-child relationships poses a threat to the children's well-being is clearly erroneous. Accordingly, we agree with the trial court that the termination of Father's parental rights over the children was appropriate under Indiana Code Section 35-35-2-4(b)(2)(B)(ii).

11

## Issue Two:  Whether Termination is in
## the Children's Best Interests

Father also argues that the DCS failed to show that termination of the parent-child relationships is in the children's best interests.  In determining what is in the best interests of a child, the trial court is required to look beyond the factors identified by the DCS and to consider the totality of the evidence.  Stewart v. Ind. Dep't of Child Servs. (In re J.S.), 906 N.E.2d 226, 236 (Ind. Ct. App. 2009).  We have previously held that the recommendations of the case manager and CASA to terminate parental rights, in addition to evidence that the continuation of the parent-child relationship poses a threat to the child, is sufficient to show by clear and convincing evidence that termination is in the child's best interests.  M.M. v. Elkhart Office of Family & Children (In re M.M.), 733 N.E.2d 6, 13 (Ind. Ct. App. 2000).

Here, in addition to the evidence described above in Issue One, the Guardian Ad Litem testified that termination of Father's parent-child relationships with the children was in the children's best interests.  The family case manager for the DCS, Lakisha Wren, also testified that termination of the parent-child relationships was in the children's best interests.  Accordingly, the trial court's conclusion that termination of Father's parental rights over the children is in the children's best interests is not clearly erroneous.  See id.

## Conclusion

In sum, the trial court's order terminating Father's parental rights over the children is not clearly erroneous.  The trial court concluded that continuing the parent-child relationships would pose a threat to the children and is not in the children's best interests.

The court's conclusions are supported by its findings and its findings are supported by the evidence. Accordingly, we affirm the trial court's termination of Father's parental rights over the children.

Affirmed.

KIRSCH, J., and MAY, J., concur.