906 N.E.2d 226 (2009)
In re The Matter of the Termination of the Parent Child Relationship of J.S., Minor Child, and Jamie Stewart and Francesca Cortellini, his Parents.
Jamie Stewart and Francesca Cortellini, Appellants-Respondents,
v.
Indiana Department of Child Services, Appellee-Petitioner.
No. 84A01-0811-JV-548.
Court of Appeals of Indiana.
May 20, 2009.
*228 William S. Frankel, Holly A. Reedy, Wilkinson, Goeller, Modesitt, Wilkinson & Drummy, LLP, Terre Haute, IN, Attorneys for Appellants.
Elizabeth A. Lewis, Indiana Department of Child Services, Terre Haute, IN, Attorney For Appellee.

*229 OPINION
RILEY, Judge.

STATEMENT OF THE CASE
Appellants-Respondents, Jamie Stewart ("Father") and Francesca Cortellini ("Mother"), appeal the trial court's involuntary termination of their respective rights to their son, J.S.
We affirm.

ISSUE
Father and Mother raise four issues on appeal, which we consolidate and restate as the following single issue: Whether there is sufficient evidence to support the trial court's order to terminate the parents' parental rights.

FACTS AND PROCEEDURAL HISTORY
Father and Mother are the biological parents of J.S., born on December 18, 2006. The parents, who are not married, have lived together since the time of J.S.'s birth. The Vigo County Department of Child Services (VCDCS) first became involved with the family on February 21, 2007, when it received a referral that then two-month-old J.S. had been hospitalized with multiple fractures, including fractures to the 6th and 7th ribs, the left tibia, and a hairline skull fracture with bleeding behind the fracture. At the time of his injuries, J.S. had been in the sole custody of his parents. Reportedly, on the day of J.S.'s injury, Mother had left the family home to go to the gas station while J.S. remained at home in Father's care. When J.S. later awoke from his nap, he was unresponsive and was taken to a local hospital. J.S. was then transferred, via ambulance, to St. Vincent's Hospital and the VCDCS was contacted. Neither parent could explain how J.S. sustained his injuries, and neither parent admitted to causing the injuries.
Later the same day, the VCDCS investigating officer, in making an oral motion for emergency detention, informed the trial court that it was believed J.S.'s physical condition was seriously endangered and that his current injuries, which occurred while J.S. was in his parents' sole custody, were caused by either an act or omission of his parents. The trial court granted the VCDCS's motion for emergency detention and issued an order directing the VCDCS case manager to take immediate temporary custody of J.S. The trial court's order also required a detention hearing be held within forty-eight hours.
On February 23, 2007, a detention hearing was held and the VCDCS filed a petition alleging J.S., who remained in the hospital, was a child in need of services ("CHINS"). The parents denied the allegations of the CHINS petition; and, following the initial hearing, the trial court issued an order setting the matter for an evidentiary hearing. The trial court also found that continued out-of-home placement was necessary to protect J.S.'s health and safety.
On June 12, 2007, a fact-finding hearing on the CHINS petition was held. At the conclusion of the hearing, J.S. was found to be a CHINS. In so finding, the trial court applied the rebuttable presumption of Indiana Code Section 31-34-12-4, namely, that J.S. was a CHINS because he was injured while in the care, custody, and control of this parents and his injuries would not ordinarily have occurred, except for an act or omission of the parents.
Following a dispositional hearing held on July 10, 2007, the trial court issued an order formally removing J.S. from his parents' custody and directing Father and Mother to participate in a variety of services in order to achieve reunification with *230 J.S. Among other things, Father and Mother were ordered to: (1) undergo psychological examinations and follow all resulting recommendations; (2) successfully complete parent education classes and be able to demonstrate a good understanding of a child's physical, emotional, and cognitive needs; (3) attend couples' counseling; (4) refrain from the use of illegal substances; (5) submit to random drug screens; (6) obtain either part-time or full-time employment; and, (7) exercise regular supervised visitation with J.S. Father and Mother were also ordered to each pay child support for J.S. in the amount of $41.00 per week. In addition, Father and Mother were both advised that a missed drug screen would be deemed to be a positive screen. On July 17, 2007, J.S. was placed in relative foster care with his maternal grandmother, who is a licensed foster parent, and his step-grandfather. At the time of the termination hearing, J.S. remained in relative foster care with his grandparents.
At the outset of the CHINS case, Father and Mother, who initially agreed with all of the VCDCS's recommendations for services except for couples' counseling, were compliant with the trial court's dispositional orders. For example, Father and Mother both submitted to psychological evaluations. They also began attending parenting classes. Both parents' participation with court orders, however, soon became inconsistent.
Although Father and Mother regularly participated in supervised visitation throughout the duration of the CHINS case, the visits with J.S. were oftentimes chaotic and volatile because of the couple's constant arguing and bickering. On one occasion, a visit had to be ended prematurely and the police had to be called due to both parents' hostile behavior toward visitation supervisors. In addition, Father and Mother were unable to produce clean drug screens, either testing positive for marijuana or failing to show for their appointments after being notified of random screens. Father and Mother also failed to maintain steady employment, declined to further participate in couple's counseling after only attending three sessions, and refused to voluntarily pay any child support for J.S.
During a permanency hearing held on January 29, 2008, the VCDCS submitted a report recommending the trial court issue an order to change the permanency plan from reunification to termination of Father's and Mother's parental rights. This recommendation was made because neither parent was fully cooperating with the case plan, and due to the severity of J.S.'s initial injuries. The trial court issued an order accepting the VCDCS's newly recommended permanency plan on the same day.
On February 28, 2008, the VCDCS filed a petition seeking to terminate Father's and Mother's respective parental rights to J.S. A fact-finding hearing on the termination petition was held on July 14, 2008, and the trial court issued an order terminating both parent's parental rights to J.S. on July 29, 2009.[1] Both parents now appeal.

DISCUSSION AND DECISION
Father and Mother both challenge the sufficiency of the evidence supporting the trial court's termination order. We begin our review by acknowledging *231 that this court has long had a highly deferential standard of review in cases concerning the termination of parental rights. In re K.S., 750 N.E.2d 832, 836 (Ind.Ct.App. 2001). Thus, when reviewing the termination of parental rights, we neither reweigh the evidence nor judge the credibility of the witnesses. In re D.D., 804 N.E.2d 258, 265 (Ind.Ct.App.2004), trans. denied. Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. Id.
At our request, the trial court made specific findings of fact and conclusions thereon in its order terminating Father's and Mother's parental rights. Where the trial court enters specific findings of fact, we apply a two-tiered standard of review. First, we must determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. Bester v. Lake County Office of Family & Children, 839 N.E.2d 143, 147 (Ind.2005). In deference to the trial court's unique position to assess the evidence, we will set aside a court's judgment terminating a parent-child relationship only if it is clearly erroneous. In re L.S., 717 N.E.2d 204, 208 (Ind.Ct.App.1999), trans. denied; see also Bester, 839 N.E.2d at 147. A finding is clearly erroneous when there are no facts or inferences drawn therefrom that support it. D.D., 804 N.E.2d at 264. A judgment is clearly erroneous only if the findings do not support the trial court's conclusions or the conclusions do not support the judgment thereon. Quillen v. Quillen, 671 N.E.2d 98, 102 (Ind.1996). If the evidence and inferences support the trial court's decision, we must affirm. L.S., 717 N.E.2d at 208.
It is axiomatic that the traditional right of parents "to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." In re M.B., 666 N.E.2d 73, 76 (Ind.Ct.App.1996), trans. denied. However, the trial court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding a termination of the parent-child relationship. K.S., 750 N.E.2d at 837. Parental rights may therefore be terminated when the parents are unable or unwilling to meet their parental responsibilities. Id. at 836.
In order to terminate a parent-child relationship, the State is required to allege and prove, among other things, that:
(B) there is a reasonable probability that:
(i) the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied; or
(ii) the continuation of the parent-child relationship poses a threat to the well-being of the child;
(C) termination is in the best interests of the child[.]
Ind.Code § 31-35-2-4(b)(2). The State must establish these allegations by clear and convincing evidence. Egly v. Blackford County Dep't of Pub. Welfare, 592 N.E.2d 1232, 1234 (Ind.1992); see also Ind. Code § 31-37-14-2. In the present case, Father and Mother challenge the sufficiency of the evidence supporting the trial court's determinations regarding Indiana Code sections 31-35-2-4(b)(2)(B) and (C). In so doing, the parents allege the trial court applied an erroneous standard in determining whether there is a reasonable probability the conditions resulting in J.S.'s removal will not be remedied, thus necessitating reversal of the court's termination order.

I. Remedy of Conditions
Although both parents acknowledge that the VCDCS introduced evidence establishing *232 that they had failed to successfully complete a majority of the court-ordered services, they nevertheless assert that the VCDCS failed to provide a "nexus between this failure [of Father and Mother] to comply with certain services and their fitness as parents." (Appellants' Br. p. 14). Thus, Father and Mother claim that although they "may have had inconsistent employment, failed to comply with drug screens, and may have argued amongst themselves and with the VCDCS case manager, the evidence was not sufficient to terminate their parental rights." (Appellant's Br. p. 15).
When determining whether a reasonable probability exists that the conditions justifying a child's removal and continued placement outside the home will not be remedied, the trial court must judge a parent's fitness to care for his or her children at the time of the termination hearing, taking into consideration evidence of changed conditions. In re J.T., 742 N.E.2d 509, 512 (Ind.Ct.App.2001), trans. denied. In so doing, the trial court may consider the parent's response to the services offered through the Department of Child Services. Lang v. Starke County Office of Family and Children, 861 N.E.2d 366, 372 (Ind.Ct.App.2007), trans. denied. Additionally, a county department of public welfare (here, the VCDCS) is not required to rule out all possibilities of change; rather, it need establish "only that there is a reasonable probability that the parent's behavior will not change." In re Kay L., 867 N.E.2d 236, 242 (Ind.Ct. App.2007).
In determining that there is a reasonable probability the conditions resulting in J.S.'s removal and continuing placement outside of both parents' care will not be remedied, the trial court made the following pertinent findings:
12. [Father] was scheduled for twenty-nine drug screens. He tested negative or clean only four times. He had seventeen no shows which were reported as dirty screens, two dilutes which also were reported as dirty screens, one screen which was cancelled due to an undefined interference, and five shows with dirty screen results. He last presented himself for a screen on November 16, 2007.
13. [Mother] was scheduled for thirty drug screens. She tested negative or clean only four times. She had thirteen no shows which were reported as dirty screens, two dilutes which also were reported as dirty screens, and eleven shows with dirty screen results. She continued to show for screens through May 14, 2008. She tested positive for marijuana even though pregnant with her second child.
14. The parents failed to complete couples' counseling though ordered to do so by the court and even though eventually agreed to by the parents. Their last attendance at couples' counseling occurred on November 5, 2007.
15. [Father] paid only $428.00 towards his support obligation of $41.00 weekly. The payments were the result of involuntary tax intercepts.
16. [Mother] paid nothing towards her support obligation of $41.00 weekly.
17. The parents argued with one another throughout the majority of visits with their child. Visits were always supervised as the parents were never in compliance with their case plans and the visits continued throughout the history of the case to be disruptive due to the parents' arguments.

*233 18. The parents were employed only sporadically and did not hold any one job for any sustained period of time.
19. The parents remained in public housing throughout the case even after the child was removed.
* * *
21. The parents failed miserably to comply with the case plans. They continued to use illegal drugs, [M]other doing so even into her current pregnancy. They continued to argue in the presence of the child while refusing to complete a couples' counseling course designed to assist them in this area. They never progressed past supervised visitations. While [M]other, at least, acknowledged that she could not explain her failure to drug screen having made a mistake in not doing so, [F]ather blamed everyone else for his problems citing others['] disrespectful behavior towards him while never assuming any responsibility for his own illegal or contrary behavior.
(Termination Order pp. 3-4). The trial court then concluded, "[t]here is a reasonable probability that the conditions which resulted in the removal of the child will not be remedied and the continuation of the parent-child relationship poses a threat to the well[-] being of the child." (Termination Order p. 4). Our review of the record reveals there is ample evidence to support these findings and conclusion, which, in turn, support the trial court's ultimate decision to terminate both Father's and Mother's parental rights to J.S.
The evidence most favorable to the trial court's judgment reveals that J.S. was initially removed from his parents' care when, at the tender age of two months, he received several serious fractures, including a skull fracture with bleeding beneath the fracture, while in the care of either one or both parents. At the time of the termination hearing, there was still no explanation as how J.S. sustained these injuries. In addition, the medical diagnosis report from St. Vincent's hospital indicated that all of J.S.'s injuries happened within 24-48 hours of admission and were "non-accidental." (Appellant's App. p. 73).
Due to the serious and unexplained nature of J.S.'s injuries, the trial court entered a dispositional order requiring both parents to participate in a variety of services designed to improve their respective abilities to "better meet the needs of their child[,]" to increase their understanding of a child's "physical, emotional, and cognitive needs[,]" and to "improve and support their relationship" with each other. (Appellants' App. p. 29). Although Father and Mother did participate in and even completed some of the court-ordered services, their participation in services was sporadic, oftentimes volatile, and ultimately unsuccessful.
Specifically, during the termination hearing, VCDCS family case manager Andrea Williams (Williams) testified that the results of the psychological evaluations had raised "even more concerns" about Father's and Mother's ability to appropriately care for J.S. and that she had a "somewhat pessimistic view" of Father's and Mother's ability to parent without "intensive training, role modeling, [and] community supports." (Tr. pp. 67-68). When asked if she believed that Father and Mother had learned anything from the parenting classes they had completed during the CHINS case, Williams replied, "In the way the visits went ... it didn't seem helpful." (Tr. p. 52). Williams further explained that Father and Mother were unable to apply the techniques they had *234 learned in their parenting classes during their visits with J.S. Williams also informed the trial court that she had not observed any decrease in the parents' fighting and arguing during their visits with J.S.
Similarly, when questioned as to whether she had observed "any improvement in [Father and Mother's] parenting style," Friends and Family visitation supervisor Holly Mullnix (Mullnix) replied, "Honestly, no. There was no major change from the beginning [visits] to recent [visits]." (Tr. p. 8). In addition, Mullnix described Father and Mother's relationship as "very volatile" and stated that the parents argued during at least "fifty percent" of their visits with J.S. (Tr. pp. 6, 14).
With regard to the trial court's remaining dispositional orders, Father and Mother both testified at the termination hearing that they were currently employed part-time; however, neither parent provided the VCDCS with proof of said employment, nor for any other job they may have held during the underlying CHINS case. Additionally, Mother acknowledged during the termination hearing that she had not shown progress in several important areas. For example, when asked whether she had made any progress with regard to her drug screens, Mother responded, "No, not with the drug screens." (Tr. p. 87). She also responded in the negative when asked whether she had progressed with couples' counseling.
Williams described the parents' employment history as "sporadic" and stated that although she was never "absolutely sure" about the exact starting and ending dates of their employment, she stated that they "they would be employed somewhere for maybe a month on average[,] and then they wouldn't have jobs. And then they would start somewhere else and work for a little while." (Tr. p. 31). Also significant, neither Father nor Mother made a single voluntary child support payment and both parents repeatedly tested positive for marijuana throughout the duration of the CHINS case.
Father's last urine screen was administered on December 26, 2007, and was positive for marijuana. In 2008, Father refused to submit to screens on the following days: January 2; February 8; March 14; March 17; April 23; May 14; and, June 16. Consequently, these screens were deemed "positive" as per the trial court's dispositional orders. Mother likewise tested positive for marijuana on repeated occasions. Although she became pregnant sometime in February 2008, Mother nevertheless tested positive for marijuana on the following dates: February 13; March 14; and May 14, 2008. In addition, several other screens in 2008 were deemed positive due to Mother's failure to show.
"[A] pattern of unwillingness to deal with parenting problems and to cooperate with those providing social services, in conjunction with unchanged conditions, support[s] a finding that there exists no reasonable probability that the conditions will change." Lang, 861 N.E.2d at 372. Although we recognize that Father and Mother did participate in some services, including parenting classes and visitation with J.S., simply going through the motions of receiving services alone is not sufficient if the services do not result in the needed change, or only result in temporary change. "Where there are only temporary improvements and the pattern of conduct shows no overall progress, the court might reasonable find that under the circumstances, the problematic situation will not improve." In re A.H., 832 N.E.2d 563, 570 (Ind.Ct.App.2005).
Based on the foregoing, we conclude that the VCDCS presented ample evidence *235 to support the trial court's determination that there is a reasonable probability the conditions resulting in J.S.'s removal from Father's and Mother's care will not be remedied. The parents' arguments to the contrary, including their assertion that the VCDCS failed to provide a nexus between the parents' (1) failure to successfully complete court-ordered services, (2) refusal to cease using illegal drugs and (3) inability to maintain stable housing and employment, and their fitness as parents to be disingenuous and amounts to nothing more than an invitation to reweigh the evidence, which we may not do. See Bester, 839 N.E.2d at 149 (stating that trial court is vested with responsibility of resolving conflicting testimony and an appellate court may not reweigh the evidence or judge witness credibility).[2]
Notwithstanding our conclusion here, we pause to address the parents' additional contention that the trial court "failed to comply with the termination statute when it applied an improper standard for determining whether the conditions which resulted in [J.S.'s] removal ... were likely to be remedied." (Appellants' Br. p. 7). Specifically, the parents argue that reversal is mandated in this case because, in its original termination order, the trial court stated that there is a reasonable probability that the conditions which resulted in the removal of the child have not been remedied. Thus, the parents contend that in failing to find the conditions that resulted in removal will not be remedied, the court applied an improper standard and in so doing, "failed to strictly comply with the requirements of the termination statute." (App.Br. p. 8). The VCDCS counters that the trial court's "use of the word `have' for `will' is merely a scrivener's error and does not warrant reversal of the termination decision." (Appellee's Br. p. 6). We must agree with the VCDCS.
Father and Mother are correct in their assertion that, in light of a parent's constitutionally protected right to establish a home and to raise his or her children, Indiana law requires strict compliance with our termination statutes. Platz v. Elkhart County Dep't of Public Welfare, 631 N.E.2d 16, 18 (Ind.Ct.App.1994). The parents have failed, however, to prove that there was no such compliance in the present case. Our review of the record reveals that the VCDCS's petition requesting the involuntary termination of Mother's parental rights specifically informed the trial court of the statutory standard to be applied in its statement number 5 as follows:

PETITION TO TERMINATE PARENT-CHILD RELATIONSHIP
The [VCDCS], by counsel, ... and pursuant to Indiana Code Section 31-35-2-4, respectfully petitions this Court to terminate the parent-child relationship between [J.S.] ... and Francesca [C], the natural mother of the child, and in support of this Petition would show the Court as follows:
* * *
5. That "there is a reasonable probability that the conditions which resulted in the removal of the child from his natural parent will not be remedied ..."
*236 (Appellant's App. p. 56) (emphasis added). It is also apparent from the trial court's April 2009 termination order that the court in fact was aware of and applied the proper standard in evaluating the evidence presented during the termination hearing. Specifically, the trial court's conclusion number three reads as follows: "There is a reasonable probability that the conditions which resulted in the removal of the child will not be remedied ...." (Termination Order p. 4) (emphasis added).
The presumption that a trial court correctly followed the law is one of the strongest presumptions applicable to our consideration of a case on appeal. Fuehrer v. Fuehrer, 651 N.E.2d 1171, 1175 (Ind. Ct.App.1995), trans. denied. Here, the fact that the VCDCS's termination petition, submitted to the trial court prior to the termination hearing, informed the court of the proper standard to be applied, together with the trial court's correct statement of the law in its April 2009 termination order and read in conjunction with all of the court's findings and conclusions, makes clear that the trial court was aware of and applied the correct standard in arriving at its decision to terminate Father's and Mother's parental rights to J.S. We therefore agree with the VCDCS and that the trial court's initial use of the word "have" was a typographical error and does not warrant reversal of the trial court's termination decision. See McBride v. Monroe County Office of Family & Children, 798 N.E.2d 185, 199 (Ind.Ct.App. 2003) (concluding trial court's use of word "possible" instead of "probable" in termination order was typographical error that did not warrant reversal in light of court's statements made during hearing and court's findings and conclusions read as a whole).

II. Best Interests
We next turn to Father's and Mother's assertion that the termination of their respective parental rights is not in J.S.'s best interests. We are mindful that, in determining what is in the best interests of a child, the trial court is required to look beyond the factors identified by the Department of Child Services and to consider the totality of the evidence. McBride, 798 N.E.2d at 203. In so doing, the trial court must subordinate the interests of the parent to those of the child. Id. The court need not wait until a child is irreversibly harmed before terminating the parent-child relationship. Id. Moreover, we have previously held that the recommendations of the case manager and court-appointed advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in the child's best interests. In re M.M., 733 N.E.2d 6, 13 (Ind.Ct.App.2000).
In addition to the findings set forth previously, the trial court made the following additional pertinent findings in determining that termination of Father's and Mother's parental rights is in J.S.'s best interests:
20. No explanation was ever offered as to the cause of the child's serious injuries suffered at the outset of the case.
* * *
22. Termination of the parents' rights is in the best interests of the child as this case has continued for seventeen months with little to no progress having been made by the parents and the child is entitled to permanency, safety, security and stability, physically, emotionally[,] and financially.
23. The [VCDCS] has a satisfactory plan for the care and treatment of *237 the child which is adoption by the maternal grandmother in whose care the child has been for the duration of the CHINS proceeding.
(Termination Order pp. 3-4). These findings are also supported by the evidence.
During the termination hearing, Williams informed the trial court that she believed termination of both Father's and Mother's parental relationships was in J.S.'s best interests. In so doing, Williams stated:
I feel that the reason why [J.S.] came into care, his injuries and ah the severity of all that ... [these] issues have not been remedied.... [T]here are a few things that were completed within the case plan[,] but it didn't seem like those things ... after finished, that they [were] applied. It does not seem to me that there is stability in [the parents'] relationship, in employment. And I still feel like [J.S.'s] safety would be jeopardized.
(Tr. p. 53). Similarly, court-appointed special advocate ("CASA") Ernestene Crawford (Crawford) also recommended termination of Father's and Mother's parental rights as being in J.S.'s best interests. Specifically, in her written report submitted to the trial court, Crawford confirmed that neither parent had been compliant with court orders pertaining to child support payments, couples' counseling, employment, and drug screens. She then concluded that "[J.S.] needs to be in a stable home environment where his physical and emotional needs are met in a loving manner" and recommended termination of both parents' parental rights to J.S. (Appellants' App. p. 74).
Based on the totality of the evidence, including the severity of J.S.'s initial injuries and Father's and Mother's failure to offer an explanation as to how J.S. sustained these injuries, both parents' failure to complete or to benefit from the many services available to them, and the testimony from both Williams and Crawford recommending termination of parental rights, we conclude that there is sufficient evidence to support the trial court's findings and ultimate determination that termination of Father's and Mother's parental rights is in J.S.'s best interests. See, e.g., In re A.I., 825 N.E.2d 798, 811 (Ind.Ct. App.2005) (concluding that testimony of CASA and family case manager, coupled with evidence that conditions resulting in continued placement outside of home will not be remedied, is sufficient to prove by clear and convincing evidence termination is in child's best interests), trans. denied; see also McBride 798 N.E.2d at 203 (concluding that testimony of child's court-appointed advocate regarding child's need for permanency supports a finding that termination of parent-child relationship is in child's best interests).

CONCLUSION
Based on the foregoing, we hold there is sufficient evidence to support the trial court's order to terminate the parents' rights.
Affirmed.
KIRSCH, J., and MATHIAS, J., concur.
NOTES
[1] In order to conduct a meaningful judicial review in the present case, this court issued an order on March 19, 2009, directing the trial court to submit a new final order containing specific findings of primary fact and conclusions thereon. The trial court timely complied with our request.
[2] Having concluded that the trial court's determination that is supported by sufficient evidence there is a reasonable probability the conditions resulting in removal will not be remedied, we need not consider whether the VCDCS presented sufficient evidence that continuation of the parent-child relationship poses a threat to J.S.'s well-being. See L.S., 717 N.E.2d at 209 (explaining Ind.Code § 31-35-2-4(b)(2)(B) is written in disjunctive).