## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Feb 23 2016, 8:47 am

*Kevin S. Smith*

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

Robert H. Bellinger, II
The Bellinger Law Office
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In re the Termination of the Parent-Child Relationship of: C.A.M., | February 23, 2016 |
| J.M., | Court of Appeals Case No. 02A03-1507-JT-967 |
| Appellant-Respondent, | Appeal from the Allen Superior Court |
| v. | The Honorable Charles F. Pratt, Judge |
| The Indiana Department of Child Services, | The Honorable Lori K. Morgan, Magistrate |
| *Appellee-Petitioner.* | Trial Court Cause No. 02D08-1409-JT-120 |

**Najam, Judge.**

## Statement of the Case

J.M. ("Father") appeals the trial court's termination of his parental rights over his minor child, C.A.M. ("Child").[1] Father presents a single issue for our review, namely, whether the trial court's judgment is clearly erroneous.

We affirm.

## Facts and Procedural History

On November 23, 2013, the Indiana Department of Child Services ("DCS"), along with law enforcement, investigated a domestic altercation between Father and Child.[2] Father had accidentally broken a picture of Child's deceased sister, and Child had then attacked Father. The same day, Father and Child signed a safety plan with DCS, agreeing that they would refrain from hurting each other, and that they would contact a mental health case manager at Park Center if further issues arose. Child was not removed at this time.

The next day, during DCS's continued assessment, the assessor learned that Child and Father had been reunited about two weeks prior to the above described event. Prior to that time, Child had been residing "with [h]is previous foster parent[]," Deanna Nelson, for "summer vacation" since the summer of 2012. Tr. at 184, 199, 225, 324. Child had been staying with Nelson for "about

---

[1] Although L.M., Child's mother, was a party to the trial court proceedings and also had her parental rights terminated, she does not participate in this appeal.

[2] Child was born on March 15, 2003.

two years." *Id*. at 334. DCS also learned that, prior to his living with Nelson, Child had resided with Mother in California beginning in 2008. *Id*. at 198-99. At some point while Child was living with Nelson in Indiana, Father filed for dissolution of his marriage to Mother and obtained legal custody over Child. *Id*. at 199. In the fall of 2013, Father told Nelson that he wanted "a chance to raise [Child]," and then Child went to live with Father. *Id*. at 184. During the DCS assessment, Father said that, although "[h]e thought he could raise [Child]," he "just couldn't at that time." *Id*. He said "he didn't have food . . . a washer and dryer . . . [or] a vehicle." *Id*. Father "felt that [Child] needed to go back with" Nelson. *Id*. However, based on the safety plan, Child was not removed.

[5] A few days later, Father left several voicemails with DCS, reiterating that he could no longer take care of Child. After DCS followed up with Father and he repeated that he could not care for Child, DCS removed Child from Father's care. Upon his removal, Child told DCS that he "kind of saw this coming." *Id*. at 186.

[6] On November 27, 2013, DCS filed a petition alleging Child to be a Child in Need of Services ("CHINS"). On December 19, the trial court adjudicated Child to be a CHINS based upon Father's and Mother's admissions, and it ordered both parents to participate in reunification services that included home-based services and parenting classes.

[7] On September 30, 2014, DCS filed its petitions for termination of the parent-child relationships between the parents and Child. Following a fact-finding hearing, the trial court entered the following findings of fact relevant to the termination of Father's parental rights:

> C. At the time of the initiation of the proceedings in the underlying CHINS case, [DCS] had received [a] referral indicating that [F]ather . . . and [C]hild . . . had gotten into an altercation. The DCS assessment worker came to the [F]ather's home and interviewed him regarding the allegations. The [F]ather informed the assessment worker that pursuant to an agreement between the mother and former foster parent, the [C]hild had lived with the former foster parent for approximately the last two years, but that[,] approximately two weeks prior to the receipt of the assessment, he had requested the opportunity to provide care for the [C]hild and the [C]hild had begun residing with him. After the initial visit to the family home, the DCS left the [C]hild in the home because the [F]ather had signed a Safety Plan agreeing not to hurt the [C]hild and agreeing to contact the police department if the mother, [L.M.], showed up at the home due to the fact that a warrant had been issued for her arrest as a result of allegations that she had battered a twelve (12) year old child. However, shortly after the initial home visit, the [F]ather contacted the assessment worker and left a voicemail message indicating that he could not care for the [C]hild and requesting that the DCS remove the [C]hild from the home. As a result of his request, the DCS removed the [C]hild and placed him in licensed foster care. At the time of the removal, the assessment worker met with the [C]hild and his counselor at his school and the [C]hild informed the assessment worker that he had seen the removal coming and that all that he wanted from his home was a map and another item. At the time of the initial removal in November of 2013, the mother was incarcerated. She was not released from incarceration until January of 2014.

D. The DCS made referrals for services for the [F]ather that were designed to assist him in remedying the reasons for removal and reasons for placement of the [C[hild outside his home and to assist him in providing the basic necessities of a suitable home for the raising of the [C]hild. The DCS made a referral for the [F]ather's completion of a Diagnostic Assessment in order to better determine his needs. The [F]ather completed the assessment and home based services and parenting education were recommended. [Father] participated in home based services, but did not complete them. He did not start the parenting education because it was difficult for him to stay focused during the home based services and he and the case manager were working on issues pertaining to the cleanliness of the home as well as transportation issues. During the underlying CHINS proceedings, [Father]'s home was not always clean and/or appropriate. At one point, he had a problem with bed bugs and other bugs and pests around his home.

E. [Father] has maintained contact with the DCS family case manager as ordered by the Court[;] however, there have been and continues to be concerns about his mental stability. Recently, during telephone conversations with the case manager, the [F]ather would alternate between anger and sadness and crying and would sometimes babble. He would express concerns that service providers and/or the police were trying to kill him and would sometimes call the case manager at 2:00 a.m. and leave messages for her. At one point during the underlying CHINS proceedings, he called the case manager and informed her that he was going to die that day. That same day, he called his Park Center case manager and talked about "ending things" because he was overwhelmed. He barricaded himself in his home and the police were called as a result of concerns about his safety and mental stability. Ultimately, he allowed the police and his Park Center case manager into his home and the incident ended peacefully.

F.  [Father] loves his son, [Child], and has participated in some of the services that he was ordered to participate in as a part of the Court's Dispositional Order.  However, he has been unable to benefit from services provided due, in large part, to his mental and physical health limitations.  He has been diagnosed with Bi-Polar Disorder and participates in mental health services provided by Park Center through an involuntary commitment to Park Center.  He is unable to manage his financial and other affairs and receives the assistance from Park Center to attend to his own needs.  His son, [Child], has been diagnosed with Post[-]Traumatic Stress Disorder and is currently in placement in a residential treatment facility.  The typical stay at the facility where he is placed is six (6) to nine (9) months[;] however, [Child] had been there for approximately one (1) year at the time of the hearing on the Petition for Termination.  In his placement facility, the [C[hild has urinated on things in his room and has been combative with staff and peers.  He is in need of a structured home environment that can provide consistency and stability and can ensure that he participates in therapy, medication management and community activities.  [Father] is unable to care for himself and is unable to care for his son on a long term basis.  He has admitted as much to some of the service providers who work with him.  The DCS has proven by clear and convincing evidence that the conditions that resulted in the [C]hild's removal and the reasons for continued placement outside the parents' home will not be remedied and/or that continuation of the parent-child relationship poses a threat to the well-being of the [C]hild and that termination of the parent-child relationship is in the [C]hild's best interests.

Appellant's App. 10-12.

[8]   In light of its findings of fact, the trial court concluded, in relevant part:

B.  The child in this case has been placed outside the care of his parents under a disposition plan for more than six (6) months

preceding the filing of the petition for the termination of the parent-child relationship.

* * *

D.  By the clear and convincing evidence the court determines that there is a reasonable probability that reasons that brought the child's placement outside the home will not be remedied. Despite the provision of services and the orders of the court, the parents did not participate in and demonstrate that they benefited from services between the time of the preliminary inquiry when interventions/services were first ordered to the time of the hearing to terminate parental rights.

* * *

F.  The Department of Child Services has thus proven by clear and convincing evidence that the allegations of the petition are true and that the parent-child relationships should be terminated.

*Id*. at 13.  This appeal followed.

# Discussion and Decision

Father appeals the trial court's termination of his parental rights over Child. We begin our review of this issue by acknowledging that "[t]he traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *Bailey v. Tippecanoe Div. of Family & Children (In re M.B.)*, 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied*.  However, a trial court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding a

termination. *Schultz v. Porter Cnty. Ofc. of Family & Children (In re K.S.)*, 750 N.E.2d 832, 837 (Ind. Ct. App. 2001). Termination of a parent-child relationship is proper where a child's emotional and physical development is threatened. *Id*. Although the right to raise one's own child should not be terminated solely because there is a better home available for the child, parental rights may be terminated when a parent is unable or unwilling to meet his or her parental responsibilities. *Id*. at 836.

[10] Before an involuntary termination of parental rights can occur in Indiana, DCS is required to allege and prove, in relevant part:

> (A) that one (1) of the following is true:
>
> > (i) The child has been removed from the parent for at least six (6) months under a dispositional decree.
>
> * * *
>
> (B) that one (1) of the following is true:
>
> > (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
> >
> > (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). DCS's "burden of proof in termination of parental rights cases is one of 'clear and convincing evidence.'" *R.Y. v. Ind. Dep't of Child Servs. (In re G.Y.)*, 904 N.E.2d 1257, 1260-61 (Ind. 2009) (quoting I.C. § 31-37-14-2).

[11] When reviewing a termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. *Peterson v. Marion Cnty. Ofc. of Family & Children (In re D.D.)*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied.* Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.* Moreover, in deference to the trial court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. *Judy S. v. Noble Cnty. Ofc. of Family & Children (In re L.S.)*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied.*

[12] Here, in terminating Father's parental rights, the trial court entered specific findings of fact and conclusions thereon. When a trial court's judgment contains special findings and conclusions, we apply a two-tiered standard of review. *Bester v. Lake Cnty. Ofc. of Family & Children*, 839 N.E.2d 143, 147 (Ind.

2005).  First, we determine whether the evidence supports the findings and, second, we determine whether the findings support the judgment.  *Id*. "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference."  *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996).  If the evidence and inferences support the trial court's decision, we must affirm.  *In re L.S.*, 717 N.E.2d at 208.

[13]  Father first challenges the trial court's conclusion that DCS met its burden under Indiana Code Section 31-35-2-4(b)(2)(B).  Father's arguments under subsection (b)(2)(B) are that DCS failed to present clear and convincing evidence that there was a reasonable probability that:  1) the conditions that resulted in Child's removal will not be remedied; or 2) the continuation of the parent-child relationship poses a threat to Child's well-being.  I.C. § 31-35-2-4(b)(2)(B)(i), (ii).

[14]  Father's arguments under those subsections are not well taken as they are merely requests for this court to reweigh the evidence.  In particular, Father points to testimony that he loves his Child, that his visits with Child were always appropriate and positive, and that he brought Child things such as food, clothing and gifts.  He also alleges that he benefited from home-based services and "substantially" complied with the trial court's dispositional orders.  Appellant's Br. at 9.  But Father does not challenge DCS's evidence, the material and significant factual findings made by the trial court, or the court's reliance on those findings in its conclusions.  Rather, he simply asserts that this court should credit evidence he deems favorable to him rather than the evidence

relied on by the trial court. But we will not reweigh the evidence on appeal. *In re D.D.*, 804 N.E.2d at 265. Accordingly, we must reject Father's arguments under subsection (b)(2)(B).

Father also challenges the trial court's conclusion that DCS demonstrated that termination of his parental rights is in Child's best interests, as required under Indiana Code Section 31-35-2-4(b)(2)(C). But, again, Father merely asks that we credit evidence he deems favorable to him rather than the evidence relied on by the trial court, which we will not do. *Id.* The trial court's conclusion is supported by the testimony of the family case manager, the court appointed special advocate, Father's recovery specialist from Park Center, and social workers from Stop Child Abuse and Neglect (SCAN). It is well established that such testimony, in addition to evidence demonstrating an element of subsection (b)(2)(B), "is sufficient to show by clear and convincing evidence that termination is in the child's best interests." *Stewart v. Ind. Dep't of Child Servs. (In re J.S.)*, 906 N.E.2d 226, 236 (Ind. Ct. App. 2009). Accordingly, we affirm the trial court's termination of Father's parental rights.

Affirmed.

Riley, J., and May, J., concur.