## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

May 28 2019, 9:01 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT - MOTHER

Cynthia Phillips Smith
Law Office of Cynthia P. Smith
Lafayette, Indiana

ATTORNEY FOR APPELLANT - FATHER

Michael B. Troemel
Lafayette, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Abigail R. Recker
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of the Parent-Child Relationship of L.M. and Li.M. (Minor Children);

A.M. (Mother) and An.M. (Father),

*Appellants-Respondents,*

v.

Indiana Department of Child Services,

May 28, 2019

Court of Appeals Case No. 18A-JT-3065

Appeal from the Tippecanoe Superior Court

The Honorable Matthew D. Boulac, Judge Pro Tempore

Trial Court Cause Nos.
79D03-1802-JT-33
79D03-1802-JT-36



*Appellee-Petitioner.*

**Najam, Judge.**

# Statement of the Case

An.M. ("Father") and A.M. ("Mother") (collectively, "Parents") appeal the juvenile court's termination of their parental rights over their minor children, L.M. and Li.M. ("Children"). Parents present two dispositive issues for our review:

> 1. Whether the juvenile court erred when it concluded that there is a reasonable probability that continuation of the parent-child relationships poses a threat to the Children's well being.
>
> 2. Whether termination of Parents' parental rights was in the Children's best interests.

We affirm.

# Facts and Procedural History

[3]     Parents have two children:  L.M., born August 27, 2014; and Li.M., born December 21, 2015.  On August 10, 2016, the Indiana Department of Child Services ("DCS") received a report that Li.M. was "significantly underweight for her age" and was "diagnosed with non-organic failure to thrive."  Father's App. Vol. II at 25.  DCS investigated Parents' home and found that it was in "disarray and cluttered with clothes, food, soiled dishes, and trash."  *Id.*  On September 7, DCS filed petitions alleging that the Children were Children in Need of Services ("CHINS").  DCS placed Li.M. with her paternal grandparents, but L.M. stayed in Parents' custody.  After a hearing, the court adjudicated the Children to be CHINS, and, on November 18, the juvenile court entered its dispositional order and instructed Parents to participate in home based case management and parenting time and to complete psychological evaluations and follow all recommendations.  In addition, the court instructed Father to participate in individual therapy.

[4]     Mother attended services, "but [she was] unwilling often times to hear things, to listen and to truly participate in the services."  Tr. Vol. 2 at 83.  Father "had a harder time in attending services and was more likely to cancel or no-show his appointments for case management."  *Id.* at 84.  Both Mother and Father did not take medications as prescribed to treat their respective mental illnesses.[1]  On

---

[1]  Father has been diagnosed with PTSD, depression, and anxiety.  Mother has been diagnosed with depression and anxiety.

April 4, 2017, DCS removed L.M. from Parents' care and placed him in foster care when it discovered deplorable living conditions in Parents' home. In particular,

> there may have [been] six (6) or seven (7) cats in the home and a new litter [of kittens] in a box in the adult's closet. There was lots of clutter, a lot, a foul smell when you go into the kitchen and there wasn't a surface in the kitchen that you could see. You couldn't see the countertops, [and] you couldn't see the table tops. . . .

*Id.* at 208.

In February 2018, DCS filed petitions to terminate Parents' parental rights over the Children. The court held a fact-finding termination hearing over multiple dates in May and August 2018. Thereafter, on November 26, the court entered the following findings of fact and conclusions of law:

> 2. [DCS] received a report on August 10, 2016 alleging that [Li.M.] was significantly underweight for her age and that she was diagnosed with non-organic failure to thrive. A second report was received on September 1, 2016 indicating [Li.M.] was hospitalized due to her weight loss.

> 3. Investigation confirmed that [Li.M.] had, in fact, been diagnosed with non-organic failure to thrive. The home was discovered in disarray and cluttered with clothes, food, soiled dishes and trash. [Li.M.] was having sporadic weight loss and had only gained 2 lbs. and 4 oz. in the four (4) months prior to the report. Medical records indicated she presented with loose skin, poor muscle tone and poor head control. DCS offered services during the assessment consisting of Homebuilders and First Steps. Both children were participating in the First Steps

program, [Li.M.] for physical therapy and [L.M.] for speech. On August 31, 2016 [Li.M.] was admitted to the hospital due to continued weight loss. Once hospitalized, [Li.M.] started to gain weight and [Li.M.'s] doctors noted that her growth could be sustained on a predictable calorie intake. [Li.M.'s] doctors diagnosed her with failure to thrive noting that environmental deprivation was the most likely reason for the condition. During the investigation, the parents were not able to determine why [Li.M.] was losing weight in their care.

4. [Li.M.] was placed in protective custody pursuant to a CHINS Detention Hearing Order issued on or about September 7, 2016. [Li.M.] has since never been returned to the care of the parents.

5. [L.M.] initially remained in the home with monitoring. [L.M.] had diaper rash and the parents had to be prompted on multiple occasions to change [L.M.'s] diaper when it was sagging and full of feces. Many times, the parents did not bathe [L.M.] without prompting and on multiple instances [L.M.] was dirty and/or wearing the same clothes for multiple days. [L.M.] was observed to eat food found on the floor and medication was left within his reach. The parents were observed cussing at [L.M.] and throwing toys. The parents were uncooperative and even combative with service providers. At times, the parents were completely unengaged with [L.M.] and once accidentally melted plastic hats left in the oven. [L.M.] was eventually placed in protective custody on April 4, 2017 after he was found with a black eye and scratches on his chest. [L.M.] has never been returned to the care of the parents since that date.

6. A CASA was appointed to represent the best interests of the children. The children were found to be Children in Need of Services ("CHINS") and a Dispositional Order was issued on or about November 3, 2016.

7.  Pursuant to dispositional orders, Mother was offered the following services:  home-based case management, mental health evaluation, psychological evaluation, random drug screens, and parenting time.  Father was offered the following services:  home-based case management, psychological evaluation, individual therapy, random drug screens, and parenting time.  These services were designed to address the parents' difficulties.

8.  Case conferences, family team meetings, and review hearings were held periodically.  [DCS] and [the] CASA prepared separate written reports and recommendations prior to each hearing.

9.  A permanency hearing was held on November 16, 2017 at which time the permanent plan was determined to be initiation of proceedings for termination of parental rights and adoption.  DCS filed its petitions in the above-referenced cause on February 26, 2018.  The evidentiary hearing on the Verified Petitions to Terminate Parental Rights was held over multiple dates including May 21, 2018, August 9, 2018, August 14, 2018 and August 20, 2018.  Over the course of these termination hearings, the circumstances of the parents have not improved.

10.  Father is unemployed.  Mother works eight (8) to sixteen (16) hours, only on weekends.  Nevertheless, from the beginning of the CHINS case, the parents struggled to maintain the conditions of the home even with extensive intervention.  While [L.M.] was still in the home, there were multiple instances of the home being in utter disarray with food on the floor, rotten food in the refrigerator, and overflowing trash receptacles all of which present a danger to small children.  The parents had to be constantly reminded to pick up the house, clean the kitchen, pick up toys, and conduct other day-to-day household chores.  The parents failed to comply with or benefit from case management services and were discharged unsuccessfully.

11.  Both parents have a long-term history of mental health issues including suicidal ideations and self-injurious behaviors and/or

suicide attempts. Mother participated in a mental health assessment in November 2016. Father participated in a mental health assessment in December of 2016. Both mental health assessments recommended that the parents participate in a parenting assessment to determine their ability to parent in a healthy manner. The parents failed to complete the recommended parenting assessment and have been discharged twice from parenting education for lack of cooperation and inability to demonstrate improvement.

12. Mother completed a psychological evaluation in January 2017. Mother was diagnosed with Major Depressive Disorder, Panic Disorder and Generalized Anxiety Disorder. The psychological evaluation indicates Mother exhibits illogical thinking and faulty logic. Mother has difficulty caring for her own needs and would struggle to maintain the additional needs of a household as well as two (2) small children. Mother is prescribed medication to address her mental health. However, Mother has failed to take her medication as directed throughout the CHINS case.

13. Father completed a psychological evaluation in February 2017. Father was diagnosed with Generalized Anxiety Disorder and Post Traumatic Stress Disorder, in partial remission. The psychological evaluation indicated that Father is of average intelligence and has the cognitive skills necessary to care for the children. However, Father struggles with changes to his routine and is more comfortable relying on others to handle important responsibilities. Father demonstrated this throughout the CHINS case by relying on Mother to maintain the house, raise the children, and pay the bills. Father is prescribed medication to address his mental health needs. However, Father has also failed to take his medication as prescribed during the CHINS case.

14. Mother did not begin recommended individual therapy until April 12, 2017. The referral for Father's individual therapy had expired by April 2017 and, at that time, no other service

providers were available. The failure of both parents to promptly engage in services has delayed reunification and prevented permanency for the children.

15. Since the beginning of the CHINS case, both parents were scheduled to participate in supervised parenting time. Both parents attended inconsistently and both parents struggled to implement instructions to improve parenting skills. Mother is quick to anger and continues to have outbursts that effect the children, especially [L.M.,] who mimics Mother's behavior. Father still requires prompting to wash his hands between changing a diaper and preparing food for the children. The parents argue with each other and undermine each other during visits which results in distraction and unsafe parenting. One visit facilitator is present to monitor safety while another is present to manage the behavior of the parents with each other and with the children. Neither parent has demonstrated an ability to sustain any brief improvement in parenting abilities.

16. The children require approximately twelve (12) to fifteen (15) doctor and/or therapist appointments each month to address developmental delays. The parents have been notified of and asked to attend these appointments multiple tunes to better understand the special needs of their children. However, the parents have attended only two (2) of over one hundred fifty (150) appoint[ment]s during the CHINS case with no reasonable explanation. The parents lack an understanding of the children's needs and are unaware of the services necessary to address the children's development. Mother acknowledges she is not prepared to take care of the children and needs additional training to manage their special needs.

17. [The] CASA, Pat Wilkerson, supports termination of parental rights and adoption in the best interests of the children. [The] CASA noted the home has not been maintained in a safe and suitable condition. Both children have been diagnosed with developmental delays since their removal from the home. Both parents have had ample opportunity to demonstrate they can

properly care for the children and have failed to do so. The parents appear apathetic to the children's special needs. [The] CASA noted the children are bonded with the foster family and are thriving in the foster home. The children are adoptable even if the current foster placement is unable to adopt for any reason. The children have been out of the home for more than fifteen (15) of the most recent twenty-two (22) months. The children need stability and permanency now.

18. Although the parents love the children, neither has the ability to meet the children's needs. It is not safe for the children to be in the care of either parent. Throughout this CHINS case, neither parent demonstrated an ability or willingness to maintain stability in any aspect of their lives. The conditions that existed at the time of removal of each child continue today[,] including lack of parenting skills, unsanitary home conditions, and untreated mental health issues. The children's well-being would be threatened by keeping the children in parent-child relationships with either parent who are unable or unwilling to meet the needs of the children. The court need not wait until the children suffer permanent harm to terminate the parent child relationships.

CONCLUSIONS OF LAW

1. There is a reasonable probability the conditions that resulted in removal of the children from the care of the parents or the reasons for continued placement outside the home will not be remedied. Neither parent has demonstrated the ability or willingness to make lasting changes from past behaviors. There is no reasonable probability that either parent will be able to maintain stability to care and provide adequately for the children.

2. Continuation of the parent-child relationships poses a threat to the well-being of the children. The children need stability in life. The children need parents with whom the children can form

a permanent and lasting bond to provide for the children's emotional and psychological as well as physical well-being.

3. DCS has a satisfactory plan of adoption for the care and treatment of the children following termination of parental rights. The children can be adopted and there is reason to believe an appropriate permanent home has or can be found for the children as a sibling group.

Appellant's App. Vol. 2 at 25-27. In light of its findings and conclusions, the court terminated Parents' parental rights over the Children. This appeal ensued.

# Discussion and Decision

## *Overview*

[6] We begin our review of this appeal by acknowledging that "[t]he traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *Bailey v. Tippecanoe Div. of Fam. & Child. (In re M.B.)*, 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied*. However, a juvenile court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding a termination. *Schultz v. Porter Cty. Off. of Fam. & Child. (In re K.S.)*, 750 N.E.2d 832, 837 (Ind. Ct. App. 2001). Termination of a parent-child relationship is proper where a child's emotional and physical development is threatened. *Id.* Although the right to raise one's own child should not be terminated solely because there is a better home available for the child, parental rights may be

terminated when a parent is unable or unwilling to meet his or her parental responsibilities. *Id.* at 836.

[7] Before an involuntary termination of parental rights can occur in Indiana, DCS is required to allege and prove:

> (B) that one (1) of the following is true:
>
> (i)  There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>
> (ii)  There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>
> * * *
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2) (2018).  DCS's "burden of proof in termination of parental rights cases is one of 'clear and convincing evidence.'"  *R.Y. v. Ind. Dep't of Child Servs. (In re G.Y.)*, 904 N.E.2d 1257, 1260-61 (Ind. 2009) (quoting I.C. § 31-37-14-2).

[8] When reviewing a termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses.  *Peterson v. Marion Cty. Off. of Fam. & Child. (In re D.D.)*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans.*

*denied.* Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.* Moreover, in deference to the juvenile court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. *Judy S. v. Noble Cty. Off. of Fam. & Child. (In re L.S.)*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*.

[9] Here, in terminating Parents' parental rights, the juvenile court entered findings of fact and conclusions thereon following an evidentiary hearing. When a juvenile court's judgment is based on such findings and conclusions, we apply a two-tiered standard of review. *Bester v. Lake Cty. Off. of Fam. & Child.*, 839 N.E.2d 143, 147 (Ind. 2005). First, we determine whether the evidence supports the findings, and, second, we determine whether the findings support the judgment. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). If the evidence and inferences support the juvenile court's decision, we must affirm. *In re L.S.*, 717 N.E.2d at 208.

[10] On appeal, Parents contend that the juvenile court erred when it concluded that: the conditions that resulted in the Children's removal will not be remedied; the continuation of the parent-child relationships poses a threat to the Children's well-being; and termination is in the Children's best interests. However, as Indiana Code Section 31-35-2-4(b)(2)(B) is written in the disjunctive, we need not address Parents' contention that the conditions that resulted in the Children's removal will not be remedied.

### Issue One:  Children's Well-being

[11]   We first address the juvenile court's conclusion that the continuation of Parents' relationships with the Children poses a threat to the Children's well-being.  A trial court need not wait until a child is irreversibly influenced by a deficient lifestyle such that his physical, mental, and social growth is permanently impaired before terminating the parent-child relationship.  *Shupperd v. Miami Cty. Div. of Fam. & Child. (In re E.S.)*, 762 N.E.2d 1287, 1290 (Ind. Ct. App. 2002).  When the evidence shows that the emotional and physical development of a child in need of services is threatened, termination of the parent-child relationship is appropriate.  *Id.*

[12]   Parents do not challenge any of the juvenile court's findings, and the findings support the court's conclusion on this issue.  In particular, Parents were unable to resolve Li.M's failure to thrive; Parents were unable to maintain a suitable home for the Children; Parents did not take medication as prescribed to treat their respective mental illnesses; Parents did not consistently participate in supervised parenting time; and Parents did not participate in the myriad of appointments the Children required to treat their special needs.  The juvenile court found that the Children were thriving in their foster home.[2]  During the

---

[2]  At some point, both Children were placed in the same foster home, where they resided at the time of the final hearing.

final hearing, the family case manager testified in relevant part regarding the Children's well-being as follows:

> I fear that the children's progress made would regress if the care of their current placement would not be maintained, appointments would not be maintained, that the children would not attend all of their therapy appointments. They would regress in that way. And really just the safety and stability at home and the parent[s'] inability to meet [the Children's] day to day needs. Those wouldn't be met either.

Tr. Vol. 2 at 123.

[13] Parents' arguments on appeal merely seek to have this Court reweigh the evidence, which we cannot do. The evidence most favorable to the trial court's judgment demonstrates that the trial court did not err when it concluded that the continuation of Parents' relationships with the Children posed a threat to the Children's well-being.

### Issue Two: Children's Best Interests

[14] Parents also asserts that the juvenile court clearly erred when it concluded that termination of their parental rights is in the Children's best interests. In determining what is in a child's best interests, a juvenile court is required to look beyond the factors identified by DCS and consider the totality of the evidence. *A.S. v. Ind. Dep't of Child Servs. (In re A.K.)*, 924 N.E.2d 212, 223 (Ind. Ct. App. 2010). A parent's historical inability to provide "adequate housing, stability, and supervision," in addition to the parent's current inability to do so,

supports finding termination of parental rights is in the best interests of the child. *Id*.

[15] When making its decision, the court must subordinate the interests of the parents to those of the child. *See Stewart v. Ind. Dep't of Child Servs. (In re J.S.)*, 906 N.E.2d 226, 236 (Ind. Ct. App. 2009). "The court need not wait until a child is irreversibly harmed before terminating the parent-child relationship." *Id*. Moreover, this Court has previously held that recommendations of the family case manager and court-appointed advocate to terminate parental rights, coupled with evidence that the conditions resulting in removal will not be remedied, are sufficient to show by clear and convincing evidence that termination is in the child's best interests. *Id*.

[16] Here, as the juvenile court's findings demonstrate, Parents have not shown that they are capable of parenting the Children. Perhaps most telling is Parents' unwillingness to participate in the Children's many appointments required to manage the Children's special needs. The Children are thriving in their placement with their foster family. Both the family case manager and the CASA testified that termination was in the Children's best interests. In particular, the family case manager testified as follows:

> Q: And you testified that the parents are not able to care for the children. Can you be more specific?
>
> A: Even just the basics like keeping them fed and keeping them

clean. And even without autism I have my doubts that they would be able to do even that part of it because their mental health issues and their combative relationship tends to rise higher than the children['s] needs.

Q: So could more time remedy any of these issues?

A: It has been two (2) years. They have had two (2) different periods of parenting education with no good results and they have not progress[ed]. So I don't know what another year of parenting education or another year of having a visit facilitator model proper parenting behavior, is going to make a difference for this family.

Q: So you think that termination of parental rights is in the best interests of these children?

A: I do.

Tr. Vol. 2 at 197. Given the totality of the evidence, Parents cannot show that the juvenile court erred when it concluded that termination of their rights was in the Children's best interests.

Affirmed.

Baker, J., and Robb, J., concur.