## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jan 24 2020, 9:38 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Kimberly A. Jackson
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Abigail R. Recker
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Termination of the Parent-Child Relationship of H.M. (Minor Child); <br><br> S.M. (Father), <br><br> *Appellant-Respondent,* <br><br> v. <br><br> Indiana Department of Child Services, <br><br> *Appellee-Petitioner.* | January 24, 2020 <br><br> Court of Appeals Case No. 19A-JT-1671 <br><br> Appeal from the Allen Superior Court <br><br> The Honorable Charles F. Pratt, Judge <br><br> Trial Court Cause No. 02D08-1809-JT-335 |

**Najam, Judge.**

# Statement of the Case

S.M. ("Father") appeals the trial court's termination of his parental rights over his minor child, H.M. ("the Child").[1] Father raises a single issue for our review, which we restate as the following three issues:

> 1. Whether certain facts found by the trial court are supported by the record.
>
> 2. Whether the trial court clearly erred when it concluded that the conditions that resulted in the Child's removal from Father's care will not be remedied.
>
> 3. Whether the court clearly erred when it concluded that termination of Father's parental rights is in the Child's best interests.

We affirm.

# Facts and Procedural History

On September 27, 2018, the Indiana Department of Child Services ("DCS") filed a petition to terminate Father's parental rights over the Child. The trial court held a fact-finding hearing on DCS's petition, after which it entered the following undisputed facts with respect to Father's relationship with the Child:

---

[1] The Child's mother has separately appealed the termination of her parental rights. Although our motions panel denied a request to consolidate the appeals, the appeals were assigned to the same writing panel, and we have decided each appeal on the same date.

5.      . . . [T]here was a physical altercation between the Mother and a man on or about July 12, 2016. The incident of domestic violence occurred in the presence of the [Child and his sibling] and the [C]hild's sibling was struck. On or about August 16, 2016, another incident of domestic violence took place in the presence of the [C]hild's sibling. The Mother was arrested for domestic battery. The Mother tested positive for cocaine on or about November 11, 2016. . . . The Court further found that [F]ather has another child who was previously adjudicated to be a child in need of services [("CHINS")]. In that case[, Father] was placed under a parent participation plan that included requirements that he participate in narcotics anonymous (NA), complete a diagnostic assessment[,] and engage in parenting classes. The Father admitted at the [f]actfinding [hearing] that he did not complete the diagnostic assessment or NA. The Court also found that [F]ather had been exercising unsupervised visits with the [C]hild in [Father's] home. The home environment was found to have "medications lying with[in] reach of the [C]hild, lack of food, and clutter lying about the home blocking exits."

6.      The Court also entered the following findings,

        "Further, the Court concludes that [Father's] historical pattern of conduct relating to the prior adjudication of [the Child] and [Father's] other child's status as a [CHINS] is relevant for this Court's conclusion that he has an inability to supply [the Child] with necessary shelter and supervision.
        The Court notes and concludes that [Father] has not completed his Court ordered services in the prior CHINS adjudication of [the Child]. [Father] has also not completed his services in the CHINS matter involving his [other child]. This Court has determined on two prior occasions that [Father's] children were in need of services and[,] in each instance, the children were not ultimately returned to his care.
        *[Father's] historical pattern of conduct is to sit idly by while his children are neglected.* While it is true that this Court is not

required to wait until a tragedy occurs to intervene for the safety and protection of [the Child], the same holds true for [Father]. His historical mode of operation is to allow the [m]others of his children to "take the fall" and then claim no culpability for the conditions of the children. The Court concludes that the efforts taken by [Father] were nothing more than token efforts to address the safety of [the C]hild. It is this neglect of his parental duties that leads the Court to the conclusion that the [C]hild's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of [Father] to supply [the Child] with necessary food, clothing, shelter, medical care, education[,] or supervision."

7. A Dispositional Hearing was held on September 12, 2017[,] as to [Father in the underlying CHINS case for Child] . . . . The [C]hild . . . w[as] placed in licensed foster care. The Dispositional Decree incorporated a Parent Participation Plan that required the Father to [comply with twelve different requirements].

\*     \*     \*

9. . . . At his Dispositional Hearing, the [F]ather was granted unsupervised weekend visits.

10. A Review Hearing was held on February 8, 2017. . . . The Father, the Court found, was cooperating with [DCS].

\*     \*     \*

23. [DCS] referred the Father to Dr. David Lombard, a forensic psychologist[,] for a diagnostic assessment. From Dr. Lombard's testimony[,] the [C]ourt finds that the Father was

scheduled for the assessment on three separate occasions but he failed to appear.

24.     The Father was referred for a drug and alcohol assessment to C.A.P., Inc.  From the testimony of Sheila M[i]ano of that agency, the Court finds that the [F]ather has failed to appear for four scheduled appointments.

*     *     *

28.     From the testimony of [DCS] case manager[] Joshua Meyer, the Court finds that the Father has canceled his visits with the [C]hild through Lifeline Services seven to eight times. In general[,] his visitation attendance has been sporadic.

29.     The [C]hild has been placed outside the home under a dispositional decree for more than six (6) months.

30.     From the testimony [of] Tracy Kearns, the [C]hild's licensed foster care provider, the Court finds that the [C]hild was suffering from nightmares and anxiety when . . . first placed into her care in August 2016.  Since then[, the Child's] nightmares have decreased and he is less anxious.

31.     The [C]hild's issues and progress in foster care are supported by the testimony of Whittington Homes and Services therapist[] Annette Cook.  Therapist Cook provides therapy for the [C]hild.  She is addressing his anxiety and coping mechanisms.  She testified that the [C]hild is stable in his foster home.  While [the Child] expresses love for his [F]ather[,] he has a strong bond with his foster family.

32. The [C]hild's therapist also testified that the [C]hild exhibits Attention [D]eficit Hyperactivity Disorder (ADHD) symptoms and is "very order oriented" and requires consistency.

33. Should parental rights be terminated[,] [DCS] has an appropriate plan, that being adoption. The [C]hild is in a potential pre-adoptive home.

34. The [C]hild's Guardian ad Litem has concluded that the [C]hild's best interests are served by the termination of parental rights. In support of his conclusion[,] he testified that the parents have not demonstrated and continuity [sic] of life stability. . . .

Appellant's App. Vol. II at 30-32, 34-35 (emphasis added; citations to the record omitted).

[4] The court also found the following three facts, which are disputed in this appeal:

25. From the testimony of [the C]hild's therapist, Annette Cook, the Court finds that the [C]hild has experienced heightened anxiety during periods of visitation with his [F]ather. The report of visitation supervisor Danielle Allen is illustrative. The Court finds from her testimony that[,] on or about September 22, 2018[,] she arrived at the Father's home[] to relieve the visitation supervisor. She observed a female on [the] front steps smoking and drinking from what appeared to be a bottle of bourbon. Upon entry into the home[,] she found her colleague on the floor with the [C]hild and the [F]ather on the couch. The woman came into the house from the steps and became angry when the visitation supervisors advised her that she could not be present. The [F]ather and the woman then went into a back room and began arguing. Later[,] the Father prepared the [C]hild a bowl of soup and then went to the couch

and smoked. He advised the [C]hild that he saw a dead body outside the window of the home.

26.     Following the filing of a petition to involuntarily terminate his parental rights[,] the Father consented to the adoption of his child born to [C.P.] He has permitted [C.P.] to be around the [C]hild in this case notwithstanding an order restricting her from being in [the Child's] presence. She has been living in the same household as the Father.

27. From the testimony of the Father[,] the Court finds that [C.P.] moved from his home on or about March 3, 2019. Soon thereafter, he permitted a man who[m] he described as a "carny" to live in his home.

*Id.* at 34 (citation to the record omitted).

[5]     In light of its findings, the court concluded as follows:

By the clear and convincing evidence[,] the [C]ourt determines that there is a reasonable probability that [the] reasons that brought about the [C]hild's placement outside the home will not be remedied. . . . The Father has not corrected his home environment to ensure the safety and consistency for a child who is diagnosed with coping issues and anxiety. Instead[,] he highlighted his observation of a dead body outside the window of his home. He has invited other adults into his home[,] including a woman prohibited from having contact [with the Child] and a "carny[."] At the time of the [C]hild's CHINS adjudication, the Court found that the Father [had] been placed under a parent participation plan in a prior CHINS case involving his son and another child. In that prior case[,] [Father] was ordered to enroll in [NA] and complete a diagnostic assessment. He did neither. He has not completed a diagnostic assessment in this present case. In the current underlying CHINS case, the Court also

found that the Father had been exercising unsupervised visits with the [C]hild in his home. The home environment was found to have "medications lying with[in] reach of the child, lack of food, and clutter lying about the home blocking exits[."] Similar environmental concerns remain. The Father has not remedied the issues that resulted in the [C]hild's removal from his care.

*Id.* at 35. The court further concluded that DCS had a satisfactory plan in place for the care and treatment of the Child and that termination of Father's parental rights was in the Child's best interests. This appeal ensued.

# Discussion and Decision

## *Standard of Review*

Father appeals the trial court's termination of his parental rights over the Child. The court's termination order recites findings of fact and conclusions thereon following an evidentiary hearing before the court. As our Supreme Court has explained, in such circumstances

> [w]e affirm a trial court's termination decision unless it is clearly erroneous; a termination decision is clearly erroneous when the court's findings of fact do not support its legal conclusions, or when the legal conclusions do not support the ultimate decision. We do not reweigh the evidence or judge witness credibility, and we consider only the evidence and reasonable inferences that support the court's judgment.

*M.H. v. Ind. Dep't of Child Servs. (In re Ma.H.)*, 134 N.E.3d 41, 45 (Ind. 2019) (citations omitted).

"Parents have a fundamental right to raise their children—but this right is not absolute." *Id.* "When parents are unwilling to meet their parental responsibilities, their parental rights may be terminated." *Id.* at 45-46. To terminate parental rights, Indiana Code Section 31-35-2-4(b)(2) (2019) requires DCS to demonstrate, as relevant here, that "[t]here is a reasonable probability that the conditions that resulted in the [Child's] removal or the reasons for placement outside the home of the parents will not be remedied" and that the "termination is in the best interests of the [Child]."

### Issue One:  Whether Findings 25, 26, and 27
### Are Supported By The Record

Father first challenges three of the trial court's factual findings. We will not set aside the trial court's factual findings unless those findings are clearly erroneous. Ind. Trial Rule 52(A). A finding is clearly erroneous "when there is no evidence supporting the finding[] . . . ." *Moriarity v. Ind. Dep't of Nat. Res.*, 113 N.E.3d 614, 622 (Ind. 2019). In our review, "we consider only the evidence and reasonable inferences that support the court's judgment." *In re Ma.H*, 134 N.E.3d at 45.

Father asserts that the trial court's finding number 25 is unsupported by the record. In that paragraph, the court found that the Child "has experienced heightened anxiety during periods of visitation with his [F]ather." Appellant's App. Vol. II at 34. The court then described as "illustrative" DCS supervisor Danielle Allen's experience of having attended a visitation with the Child at Father's home, in which Allen:  observed a girlfriend of Father's drinking

alcohol on the front steps on Allen's way in; observed that woman become angry at the DCS employees during the visit; observed Father give the Child a bowl of soup and then go back to "the couch and smoke[]"; and heard Father tell the Child that the Father had seen "a dead body outside the window of the home." *Id.*

[10] Father disputes that paragraph only "to the extent that it suggests that [that day's visitation] was 'illustrative' of the [C]hild's 'heightened anxiety' . . . ." Appellant's Br. at 20. In other words, Father does not challenge that the Child had heightened anxiety during at least some periods of visitation with Father, and Father does not challenge Allen's testimony as recited in that paragraph. Rather, Father challenges only the weight the court gave Allen's experience that day. We do not reweigh the evidence on appeal. This finding is not clearly erroneous.

[11] Father next asserts that the trial court's finding number 26 is unsupported by the record. In that paragraph, the court found that Father had "permitted [C.P.] to be around the [C]hild in this case notwithstanding an order restricting her from being in [the Child's] presence" and that "[s]he has been living in the same household as the Father." Appellant's App. Vol. II at 34. DCS case manager Joshua Meyer testified that C.P. had been "court ordered . . . not to be around [the Child] earlier in the case," Tr. Vol. 2 at 203; that DCS employees had unspecified "concerns" that, when Father had had unsupervised visits with the Child, he had permitted C.P. to be around the Child, *id.* at 241; and that, after the unsupervised visits had been converted to supervised visits, Father had

permitted C.P. to "move[] in," but no DCS employees had observed C.P. in the Child's presence during those supervised visits, *id.* at 203.

[12] In other words, the court's finding that C.P. had been ordered to not be in the Child's presence is correct; the finding that C.P. had for some period of time lived in the same household as Father is correct; but the finding that Father had "permitted . . . [C.P.] to be around the [C]hild" is not supported by substantial evidence. Appellant's App. Vol. II at 34. Accordingly, on that point we agree with Father that the trial court's finding is clearly erroneous. We will consider the impact, if any, of this error in Issues Two and Three below.

[13] Father also asserts that the trial court's finding number 27 is unsupported by the record. In that paragraph, the court found, in relevant part, that Father had "permitted a man he described as a 'carny' to live in his home" beginning in March of 2019. *Id.* The court's finding is an accurate assessment of Father's testimony. Father testified that, as of the termination hearing, he had "a buddy of mine" living with him. Tr. Vol. III at 60. Father stated that his buddy was "a carnie. He's kind of homeless but he's . . . got his bus ticket and everything . . . . He leaves . . . on April 31st . . . ." *Id.* Thus, the court's finding is supported by the record. Insofar as Father complains about "any negative inference" the court attached to that testimony, Father's complaint goes to the weight of the evidence, which we will not consider. Appellant's Br. at 24. This finding is not clearly erroneous.

### *Issue Two: Whether The Conditions That Resulted In Removal Will Not Be Remedied*

[14]     We next consider Father's argument that the trial court clearly erred when it concluded that the conditions that resulted in the Child's removal will not be remedied. In determining whether the conditions that led to a child's placement outside the home will not be remedied, a trial court is required to (1) ascertain what conditions led to the child's removal or placement and retention outside the home; and (2) determine whether there is a reasonable probability that those conditions will not be remedied. *R.C. v. Ind. Dep't of Child Servs. (In re K.T.K.)*, 989 N.E.2d 1225, 1231 (Ind. 2013).

#### 1. The Reasons for the Child's Nonplacement in Father's Care

[15]     Father first disputes the reasons the Child was not placed in his care following the Child's removal from his mother's home. The trial court stated that DCS did not place the Child in Father's care because "[t]he home environment was found to have 'medications lying with[in] reach of the [C]hild, lack of food, and clutter lying about the home blocking exits[.']" Appellant's App. Vol. II at 35. According to Father, this is inaccurate—the Child was removed from the care of his mother due to the mother's domestic violence and drug use, and DCS did not then place the Child with Father because Father had other open CHINS cases that he was noncompliant in attempting to resolve. Appellant's Br. at 25-26. DCS agrees that this is the correct explanation of why the Child was removed from his mother's home and placed in foster care. Appellee's Br. at 23.

We do not read the court's termination order so narrowly as to preclude this explanation for why the Child was placed in foster care and not in the care of Father. Indeed, findings 5, 6, and 7—which are not disputed on appeal—tell exactly that story, and the court's subsequent statement regarding the initial conditions of Father's home at the time of the Child's removal from Mother's care is contained within those findings. Accordingly, we cannot say that the termination order is clearly erroneous in describing the conditions that led to the Child's initial placement outside of Father's care.

## 2. Whether Those Reasons Will Be Remedied

We thus turn to Father's assertion that the court erred when it concluded that the reasons that led to the Child's initial placement outside of Father's care will not be remedied. In order to determine whether there is a reasonable probability that the conditions that resulted in removal will not be remedied, the court should assess a parent's "fitness" at the time of the termination hearing, taking into consideration any evidence of changed conditions. *E.M. v. Ind. Dep't of Child Servs. (In re E.M.)*, 4 N.E.3d 636, 643 (Ind. 2014). The court must weigh any improvements the parent has made since removal against the parent's "habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation." *Id.* When making such decisions, courts should consider evidence of a "parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, lack of adequate housing, and employment." *Evans v. St. Joseph Cty. Off. of Fam. & Child. (In re A.L.H.)*, 774 N.E.2d 896, 990 (Ind. Ct. App. 2002).

[18]     Again, Father's challenge here focuses on the court's description of his home environment at the time of the Child's initial placement in foster care and the court's ensuing statement that "[s]imilar environmental concerns remain." Appellant's App. Vol. II at 35. Father asserts that the trial court's assessment of the conditions of his home at the time of the fact-finding hearing are not supported by substantial evidence. Appellant's Br. at 26-27.

[19]     Having held that the termination order as a whole demonstrates that the reasons for the Child's placement in foster care included his noncompliance with services aimed at reunification, we likewise hold that the order shows that those reasons for the Child's placement outside of Father's care will not be remedied. Findings 23, 24, and 28—which, again, Father does not challenge— demonstrate that Father remained noncompliant with services, including supervised visitation with the Child. He repeatedly failed to appear for an initial psychological assessment and for an initial drug and alcohol assessment. And his visitation with the Child was described as "sporadic." Appellant's App. Vol. II at 34.

[20]     Moreover, we agree with the trial court's conclusion that, as of the fact-finding hearing, Father's home environment remained unsuitable for the Child. The court found, and Father does not dispute, that the Child had mental-health issues relating to anxiety and failure to cope with his circumstances and that the Child would benefit from consistency. Yet, the evidence supports the trial court's findings that, notwithstanding the Child's anxiety, Father told the Child that Father had seen a dead body outside Father's home. And, notwithstanding

the Child's need for consistency, Father permitted a woman who was prohibited from being in the presence of the Child to live with Father for a short time, and he similarly permitted a transient person to live with him for some time. Father's actions, along with his "historical pattern of conduct to sit idly by while his children are neglected" and not be proactive in the care of the Child, did not create a home environment that would have been consistent with the Child's mental-health issues and needs. Appellant's App. at 31. Father's argument to the contrary on appeal is simply a request for this Court to reweigh the evidence, which we will not do.

[21] Accordingly, we cannot say that the trial court's conclusion that the conditions that resulted in the Child's placement outside of Father's care will not be remedied is clearly erroneous. We additionally note that our analysis of this issue is independent of the court's factual error described in paragraph 12 above. As our Appellate Rules make clear, no error in the trial court's judgment "is ground for . . . reversal on appeal where its probable impact, in light of all the evidence in the case, is sufficiently minor so as not to affect the substantial rights of the parties." Ind. Appellate Rule 66(A). We can say with confidence that the court's erroneous statement that Father had permitted C.P. to be around the Child is sufficiently minor as to not have affected Father's substantial rights on this issue.

### Issue Three: The Child's Best Interests

[22] Last, Father asserts that the trial court clearly erred when it concluded that the termination of his parental rights was in the Child's best interests. In

determining whether termination of parental rights is in the best interests of a child, the trial court is required to look at the totality of the evidence. *A.S. v. Ind. Dep't of Child Servs. (In re A.K.)*, 924 N.E.2d 212, 224 (Ind. Ct. App. 2010). "A parent's historical inability to provide adequate housing, stability[,] and supervision coupled with a current inability to provide the same will support a finding that termination of the parent-child relationship is in the child's best interests." *Castro v. State Off. of Fam. & Child.*, 842 N.E.2d 367, 374 (Ind. Ct. App. 2006), *trans. denied*. "Additionally, a child's need for permanency is an important consideration in determining the best interests of a child." *In re A.K.*, 924 N.E.2d at 224.

[23] When making its decision, the court must subordinate the interests of the parents to those of the child. *See Stewart v. Ind. Dep't of Child Servs. (In re J.S.)*, 906 N.E.2d 226, 236 (Ind. Ct. App. 2009). "The court need not wait until a child is irreversibly harmed before terminating the parent-child relationship." *Id.* Moreover, this Court has previously held that recommendations of the family case manager and court-appointed advocate to terminate parental rights, coupled with evidence that the conditions resulting in removal will not be remedied, are sufficient to show by clear and convincing evidence that termination is in the child's best interests. *Id.*

[24] Here, the Child's guardian ad litem testified that termination of Father's parental rights would be in the Child's best interests because Father had not made any "meaningful progress" toward putting himself "in a stable position in life . . . where [he] can effectively serve as custodian[]" of the Child. Tr. Vol. 2

at 178-79. Further, the Child's therapist testified that Child's mental health had improved since removal from Father's care and placement in foster care. And, as explained above, the evidence is sufficient to show that the conditions that resulted in the Child's removal will not be remedied.

[25] Children need consistent and reliable care as well as permanency. The totality of the evidence supports the trial court's conclusion that termination of Father's parental rights is in the Child's best interests. Further, as in Issue Two, our analysis of this issue is independent of the court's factual error described in paragraph 12 above. Thus, we can say with confidence that the probable impact of the court's erroneous statement that Father had permitted C.P. to be around the Child is sufficiently minor as to not have affected Father's substantial rights on this issue. *See* App. R. 66(A). Father's argument on this issue is, again, simply a request for this Court to reweigh the evidence, which we cannot do.

## Conclusion

[26] In sum, we affirm the trial court's termination of Father's parental rights over the Child.

[27] Affirmed.

Vaidik, J., and Tavitas, J., concur.