## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Jul 17 2020, 9:12 am

**C L E R K**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Don R. Hostetler
Hostetler Law LLC
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Katherine A. Cornelius
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of the Parent-Child Relationship of: B.R. and A.R. (Minor Children);

K.W. (Mother),

*Appellant-Respondent,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner.*

July 17, 2020

Court of Appeals Case No. 20A-JT-104

Appeal from the Marion Superior Court

The Honorable Mark A. Jones, Judge

The Honorable Peter P. Haughan, Magistrate

Trial Court Cause Nos.
49D15-1902-JT-240
49D15-1902-JT-241

**Najam, Judge.**

# Statement of the Case

K.W. ("Mother") appeals the trial court's termination of her parental rights over her minor children B.R. and A.R. (collectively, "Children"). Mother presents three issues for our review, which we consolidate and restate as whether the Indiana Department of Child Services ("DCS") presented sufficient evidence to support the termination of her parental rights.

We affirm.

# Facts and Procedural History

Mother and R.R. ("Father") (collectively, "Parents") have two children together: B.R., born September 4, 2013, and A.R., born November 11, 2014. On August 8, 2016, DCS filed a petition alleging that Children were children in need of services ("CHINS") because Mother "[had] tested positive for methamphetamine, amphetamine, and marijuana," and Children "had on dirty clothing, had unkempt hair, and appeared to be hungry." Ex. at 48. DCS also alleged that Father had been "unable or unwilling to protect his children while in the care and custody of [Mother]." *Id.* On August 29, Mother, by her counsel, admitted at the pretrial hearing that, because she "[had] used methamphetamine and would benefit from services provided by DCS, the [C]hildren are in need of services." *Id.* at 71. On April 3, 2017, Father waived his right to be tried separately, and the court adjudicated Children as CHINS.

On May 1, 2017, the court entered a Parental Participation Order, which required Mother to engage in a home-based therapy program and a home-based

case management program referred by the Family Case Manager ("FCM") and required Mother to complete a parenting assessment and a psychological evaluation. The court also issued a dispositional decree and awarded wardship of Children to DCS. On February 19, 2019, DCS filed petitions to terminate Mother's parental rights over Children. And on August 24 and September 27, the juvenile court held an evidentiary hearing on those petitions.

[5] DCS presented the testimony of several witnesses at the evidentiary hearing. Dr. Sean Samuels, a licensed psychologist, had administered the Wechsler Adult Intelligence Scale assessment for Mother. Mother scored a sixty, which is in the extremely low range. This score indicated that she would need continuous assistance across time to be able to retain information. Dr. Samuels also administered the Repeatable Battery for the Assessment of Neuropsychological Status test. Mother's scores on that test indicated that she is likely to experience significant difficulties with verbal learning, processing and using visuospatial information, fluent use of language, basic attention, and speed of information processing. She may also demonstrate mild difficulties with recognition and retrieval of long-term memory stores. Mother met the diagnostic criteria for Intellectual Disability, Mild and Adjustment Disorder with Depressed Mood. At the evidentiary hearing, Dr. Samuels testified that he was concerned that "[Mother] would be unwilling to ask for assistance or be able to rely upon other people," and, as Children become more complex, "things are going to be very difficult for her to keep up with." Tr. Vol. 2 at 21. He also testified that he did "not expect [Mother's] scores to increase; however,

if she had [a] traumatic brain injury or [another] stroke or something, those scores could decrease." *Id.* at 22.

[6] Tenea Robinson ("Robinson") testified that she served as the supervised visit facilitator for Mother and Children between May 2017 and April 2018. At one point during this period, Mother was permitted unsupervised in-home visits with Children, and Robinson would come to the home to conduct pop-ins to see how Mother and Children interacted with each other. During several pop-in visits, Robinson observed other adults in the home, and Mother did not have authorization to have anyone else at her visits. On one occasion, Mother could not remember if she had fed Children adequate food. Robinson testified at the hearing that she had some concerns with Mother meeting Children's needs as Mother "required a lot of assistance with re-direction with the [C]hildren." *Id.* at 218.

[7] Michelle Walkey-Thornburg testified that she was the therapist for Children from June 2018 to November 2018. Children told Walkey-Thornburg that Father had sexually abused each of them several times. A.R. also told Walkey-Thornburg that B.R. had touched her vagina and anus. On one occasion, A.R. masturbated in front of Walkey-Thornburg and tried to touch Walkey-Thornburg's breast. During a therapy session, B.R. pulled toilet paper out of her vagina and put it into her mouth. Walkey-Thornburg observed a visit between Mother and Children in September 2018, and she described it as "chaotic" with Children running and yelling. *Id.* at 142. Mother tried to redirect the whole time but did not succeed. Walkey-Thornburg recommended

that Children be placed in separate placements because B.R. had repeatedly touched A.R. in a sexual manner.

[8] Rayna Coe testified that she served as a supervised visit facilitator for Mother. Coe had concerns with Mother's parenting due to a lack of discipline, a lack of consistency, and the continuing need for re-direction. During visits, Coe would redirect Mother and model an appropriate response, but Mother did not improve and continued to need re-direction. Because Mother's lack of consistency and discipline resulted in safety concerns, Coe believed that Mother could not meet the needs of Children, especially given their sexual trauma. Coe testified at the hearing that the court should terminate Mother's parental rights as Children are "thriving in a stable and supportive environment and are receiving the support that they need to move on in a healthy way." *Id.* at 166.

[9] Stacy Batts testified that she served as a supervised visit facilitator for Mother, and she has supervised over 300 visitation hours for Mother. Children displayed sexual behaviors during those visits, and they would not listen to Mother. Children routinely had temper tantrums and engaged in masturbation until aides stepped in to stop them. During visits, Children dominated Mother. They would sometimes scream at Mother, not listen to Mother, throw items at Mother, and tell Mother what they would do and what they would not do. Batts described her work with Mother as "more coaching than facilitating" for the first two months. *Id.* Mother would only implement the coaching when Batts was watching. Batts testified that, because she could not firmly say that Mother "would keep the [Children] safe" from sexual abuse, Mother could not

meet Children's needs. *Id.* at 198. Batts also testified that the court should terminate Mother's parental rights because she believed that Mother could not "be a primary caregiver" for Children. *Id.* at 200.

[10] From August 2016 to January 2019, Jennifer Ankney served as Children's guardian ad litem ("GAL"). Ankney observed visits between Mother and Children, and she described the visits as "chaotic." *Id.* at 115. Ankney believed that the Parents should not be given additional time to remedy the conditions that led to the removal of Children because: the case had been open for nearly three years; DCS had given each parent numerous service providers and numerous services to address their needs; and there had been no improvement by the Parents. Ankney testified at the hearing that it is in the best interest of Children to terminate Mother's parental rights because Mother "was unable to maintain the education that she was given with her providers . . . and then apply it." *Id.* at 120. Mother was also "unwilling to keep the alleged perpetrator away from B.R." *Id.*

[11] Octavia Lee has been assigned to Children's case as a Family Case Manager since July 2018. Lee had concerns with Mother's ability to retain information as well as understand the appropriate parenting it takes to parent children with trauma. She also had concerns about Mother's ability to provide Children with safe and stable housing as Mother is not currently employed and only receives $771.00 a month in disability. Lee believed that there are no additional services that can help rectify Mother's issues and that she should not be given extra time to remedy the issues. Lee testified at the hearing that, to achieve "the

permanency that they need to live a safe and stable life in the future," it is in Children's best interest to terminate Mother's parental rights. Tr. Vol. 3 at 5.

[12] DCS presented evidence that on October 18, 2018, DCS placed B.R. in a pre-adoptive foster home with D.G. and L.G. When DCS first placed B.R. with them, she would hide food, touch herself in a sexual manner, and then complain that her vaginal area hurt. Since B.R. has been in the care of D.G. and L.G., she has stopped touching herself. B.R. is a very joyful kid in the foster home, and she calls D.G. and L.G. by the names, "Daddy" and "[M]ommy." Tr. Vol. 2 at 84.

[13] DCS presented evidence that on November 16, 2018, DCS placed A.R. in a pre-adoptive foster home with A.K. and J.K. When DCS placed A.R. with them, she had a hard time getting to sleep, had night terrors, and cried when she was told no. A.R.'s aggressive behaviors would almost always coincide with her visits with Parents. A.R. is bonded with A.K. and J.K., and she calls them by the names, "Dad" and "Mom." *Id.* at 74.

[14] At the conclusion of the evidentiary hearing, the juvenile court entered the following findings and conclusions:

> 80. Conditions Resulting in Removal or Reasons for Placement Outside the Home.
>
> * * *
>
> > (g) The conditions that led to Children's removal or placement and retention outside the home of Mother

are: her issues with substance abuse; her inability to grasp and remember parenting skills; and her inability to safely and adequately parent the Children.

(h) Although Mother has remedied her issues with substance abuse, the other conditions have not been remedied. Mother is unable to grasp and remember parenting skills, and she has made little to no progress in being able to safely and adequately parent the Children. Mother has not demonstrated the ability to care for Children without the assistance of service providers and has not progressed in any of her services.

([i]) It is highly probable that these conditions will not be remedied, even if Mother was given additional time to remedy the conditions.

(j) There is a substantial probability that future neglect or deprivation will occur because of Mother's failure to remedy the conditions.

\* \* \*

(o) DCS has shown by clear and convincing evidence that there is a reasonable probability that Mother will not remedy the conditions that resulted in Children's removal.

81. Threat to the Well-Being of the Children.

\* \* \*

(c) The Children's emotional and physical development are threatened by a continuing parent-child relationship with Mother and by Mother's custody. Mother has not remedied the conditions

that led to [the] removal and retention of the Children from her care. Mother lacks the necessary parenting skills to adequately care for the Children and provide them with a safe and stable home.

* * *

(e) Children are thriving in their pre-adoptive placement. It is highly probable that a future parent-child relationship between [Mother] and Children threatens the stability, safety, and progress the [C]hildren have achieved.

(f) DCS has shown by clear and convincing evidence that there is a reasonable probability that the continuation of the parent-child relationship between Mother and Children poses a threat to the well-being of Children.

82. Termination in Best Interests of the Children

* * *

(f) Based on the above-listed findings, Mother has not demonstrated the ability and willingness to parent Children, to provide Children with a permanent, safe and stable home environment, and to provide for Children's long-term and short-term needs.

* * *

(h) Both the FCM and the GAL believe that the termination of Mother's parental rights and the adoption of the Children by their respective foster care placements is in the Children's best interests.

> (i) DCS has shown by clear and convincing evidence that termination of Mother's parental rights is in the best interests of Children.

Appellant's App. Vol. 2 at 37-40. Accordingly, the court terminated the parent-child relationship between Mother and Children, and this appeal ensued.

# Discussion and Decision

## *Standard of Review*

Mother asserts that the trial court erred when it terminated her parental rights. We begin our review of this issue by acknowledging that "[t]he Fourteenth Amendment of the United States Constitution protects the traditional right of parents to establish a home and raise their children." *Z.G. v. Marion Cty. Dep't of Child Servs. (In re C.G.)*, 954 N.E.2d 910, 923 (Ind. 2011). However, a trial court "must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding the termination." *J.W. v. Ind. Dep't of Child Servs. (In re G.F.)*, 135 N.E.3d 654, 660 (Ind. Ct. App. 2019). It is proper to terminate a parent-child relationship if "a child's emotional and physical development is threatened." *D.T. v. Ind. Dep't of Child Servs. (In re K.T.)*, 137 N.E.3d 317, 325 (Ind. Ct. App. 2019). "Although the right to raise one's own child should not be terminated solely because there is a better home available for the child, parental rights may be terminated when a parent is unable or unwilling to meet his or her parental responsibilities." *Id.*

Before an involuntary termination of parental rights can occur in Indiana, DCS is required to allege and prove:

(B) that one (1) of the following is true:

      (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

      (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

* * *

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2) (2020). DCS's "burden of proof in termination of parental rights cases is one of 'clear and convincing evidence.'" *R.Y. v. Ind. Dep't of Child Servs. (In re G.Y.)*, 904 N.E.2d 1257, 1260–61 (Ind. 2009) (quoting I.C. § 31-37-14-2).

[17] When reviewing the termination of parental rights, we do not reweigh the evidence or judge witness credibility. *Peterson v. Marion Cty. Off. of Fam. & Child. (In re D.D.)*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*. Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.* Moreover, in deference to the trial court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-

child relationship only if it is clearly erroneous. *Judy S. v. Noble Cty. Off. Of Fam. & Child. (In re L.S.)*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*.

[18]    Here, in terminating Mother's parental rights, the trial court entered specific findings of fact and conclusions thereon. When a trial court's judgment contains special findings and conclusions, we apply a two-tiered standard of review. First, we determine whether the evidence supports the findings and, second, we determine whether the findings support the judgment. *In re C.G.*, 954 N.E.2d at 923. "'Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference.'" *State v. Int'l Bus. Machs. Corp.*, 51 N.E.3d 150, 158 (Ind. 2016) (quoting *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996)). If the evidence and inferences support the trial court's decision, we must affirm. *In re L.S.*, 717 N.E.2d at 208.

[19]    On appeal, Mother asserts that the trial court erred when it concluded that: (1) she will not remedy the conditions that resulted in Children's removal and the reasons for their replacement outside of her home; (2) there is a reasonable probability that the continuation of the parent-child relationships poses a threat to the well-being of Children; and (3) termination is in Children's best interests. However, as Indiana Code Section 31-35-2-4(b)(2)(B) is written in the disjunctive, we need not address the issue of whether there is a reasonable probability that the continuation of the parent-child relationships poses a threat to the well-being of Children.

*Reasons for Children's Placement Out of Mother's Home*

[20] Mother contends that DCS did not present sufficient evidence to prove that she will not remedy the conditions that led to the Children's removal from her home. And she asserts that the court erred when it identified the reasons for the Children's *initial removal*. But Mother ignores the court's findings with respect to the reasons for the Children's *continued placement* outside of Mother's home, which support the court's conclusion.

[21] This Court has clarified that, given the wording of the statute, it is not just the basis for the initial removal of the child that may be considered for purposes of determining whether a parent's rights should be terminated, but also any basis resulting in the continued placement outside of a parent's home. *Inkenhaus v. Vanderburgh Cty. Off. of Fam. & Child. (In re A.I.)*, 825 N.E.2d 798, 806 (Ind. Ct. App. 2005), *trans. denied*. To determine whether there is a reasonable probability that Mother will remedy the reasons for Children's continued placement outside of her home, the trial court should judge Mother's fitness to care for Children at the time of the termination hearing, taking into consideration evidence of changed conditions. *See E.M. v. Ind. Dep't of Child Servs. (In re E.M.)*, 4 N.E.3d 636, 643 (Ind. 2014). However, the court must also "evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child." *Moore v. Jasper Cty. Dep't of Child Servs.*, 894 N.E.2d 218, 226 (Ind. Ct. App. 2008) (quotations and citations omitted). Pursuant to this rule, courts have properly considered evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect,

failure to provide support, and lack of adequate housing and employment. *Id.* Moreover, DCS is not required to rule out all possibilities of change; rather, it need establish only that there is a reasonable probability the parent's behavior will not change. *Id.*

[22] The trial court identified the following conditions "that led to the Children's removal *or placement and retention outside the home of Mother . . .* : her issues with substance abuse; her inability to grasp and remember parenting skills; and her inability to safely and adequately parent the Children." Appellant's App. Vol. 2 at 38 (emphasis added). Mother's contention that the court's findings on this issue are clearly erroneous is difficult to discern. Mother appears to suggest that, because DCS initially removed Children from her care for reasons different than those identified by the court, the court's finding is clearly erroneous. But Mother ignores the fact that the list of conditions refers to the reasons for the Children's initial removal as well as their continued placement in foster care. Thus, Mother's argument misses the mark.

[23] The court found, and the evidence supports that: Mother continuously needed assistance with re-direction from supervised visit facilitators; Children dominated Mother during visits; Mother is not currently employed and only receives $771.00 a month in disability; and Mother will have difficulties keeping up with Children's needs as they become more complex. Based on the totality of the circumstances, we hold that the trial court's findings support its conclusion that Mother will not remedy the conditions that resulted in Children's continued placement outside of her home. Mother's contentions to

the contrary are merely requests that we reweigh the evidence, which we will not do.

[24] Finally, to the extent Mother contends that DCS improperly suggested that the court should terminate her parental rights based solely on her mental disability—and that the court did so—Mother does not direct us to anything in the record to support that contention. In any event, again, Mother's assertions on this issue are directed solely at the reasons for the initial removal of the Children, and she does not address the court's findings with respect to the Children's continued placement outside of her home. Mother does not, for instance, allege that it was improper for the court to find that she was unable either "to grasp and remember parenting skills" or "safely and adequately parent the Children." Appellant's App. Vol. 2 at 38.

*Best Interests*

[25] Mother next contends that the trial court erred when it concluded that termination of her parental rights is in Children's best interests. In determining what is in a child's best interests, a juvenile court is required to look beyond the factors identified by DCS and consider the totality of the evidence. *A.S. v. Ind. Dep't of Child Servs. (In re A.K.)*, 924 N.E.2d 212, 223 (Ind. Ct. App. 2010). A parent's historical inability to provide "adequate housing, stability, and supervision," in addition to the parent's current inability to do so, supports a finding that termination of parental rights is in the best interests of the child. *Id.*

[26] When making its decision, the court must subordinate the interests of the parents to those of the child. *See Stewart v. Ind. Dep't of Child Servs. (In re J.S.)*, 906 N.E. 2d 226, 236 (Ind. Ct. App. 2009). "The court need not wait until a child is irreversibly harmed before terminating the parent-child relationship." *Id.* Moreover, this Court has previously held that recommendations of the family case manager and court-appointed advocate to terminate parental rights, coupled with evidence that the conditions resulting in removal will not be remedied, are sufficient to show by clear and convincing evidence that termination is in the child's best interests. *Id.*

[27] As the trial court's findings demonstrate, Mother has not shown that she is capable of parenting Children. Mother required continuous assistance with re-direction from others, and she is not currently employed and only receives $771.00 a month in disability. Children have been living with their respective foster families since late 2018. They are bonded and thriving. Both the GAL and FCM recommended that the court should terminate Mother's parental rights. Given the totality of the evidence, Mother cannot show that the trial court erred when it concluded that termination of her rights was in Children's best interests.

[28] Mother's contention that the trial court relied on the GAL's and the FCM's recommendations as "the sole basis for the termination of parental rights" is entirely without merit. Appellant's Br. at 22. In addition to the GAL's and FCM's recommendations, the court also supported its finding with evidence that shows that Mother had not demonstrated the ability and willingness to

parent Children, to provide Children with a permanent, safe and stable home environment, and to provide for Children's long-term and short-term needs. Mother has not shown that the trial court's conclusion on this issue is clearly erroneous.

[29] Affirmed.

Kirsch, J., and Brown, J., concur.